The MORRISON MILLING COMPANY et al., Appellants,

v.

Orville L. FREEMAN et al., Appellees.

NATIONAL BISCUIT COMPANY and The Quaker Oats Company, Appellants,

v.

Orville L. FREEMAN and Commodity Credit Corporation, Appellees.

Nos. 19794, 19795.

United States Court of Appeals District of Columbia Circuit.

Argued April 4, 1966.

Decided July 18, 1966.

Mr. Jerry L. Buchmeyer, Dallas, Tex., for The Morrison Milling Company, and certain other appellants in No. 19,794.

Mr. Brice M. Clagett, Washington, D. C., with whom Messrs. Howard C. Westwood and Cyril V. Smith, Jr., Washington, D. C., were on the brief, for General Mills Inc., and certain other appellants in No. 19,794, and appellants in No. 19,-795.

Mr. Carl Eardley, Attorney, Department of Justice, with whom Messrs. J. William Doolittle, Attorney, Department

of Justice, and David G. Bress, U. S. Atty., were on the brief, for appellees. Messrs. Alan S. Rosenthal and Richard S. Salzman, Attorneys, Department of Justice, also entered appearances for appellees.

Before BAZELON, Chief Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

These appeals from the District Court involve an attack by a number of wheat processors upon regulations issued and observed by the Secretary of Agriculture under the Agricultural Act of 1964. 78 Stat. 177, as amended, 7 U.S.C. § 1301 *et seq.* The regulations are asserted to be in direct conflict with the statute and, in any event, arbitrary and capricious. These claims were unavailing in the District Court which, on cross-motions for summary judgment, granted that relief to appellees. The issues raised before us relate solely to the merits; and, for the reasons appearing hereinafter, we affirm the District Court.

I

The controversy is a consequence of a change by Congress in the method of providing financial support for the American wheat grower. Immediately prior to July 1, 1964—the effective date of the statute here in issue—the grower could count on $2.00 per bushel. This was available in the form of (1) a price support loan of $1.82 and (2) a Commodity Credit Corporation payment of 18¢. Under the new scheme, the loan level was reduced to $1.30, and a system of marketing certificates was set up. That scheme provided for an estimate by the Secretary of the national marketing quota of wheat. This included, among other things, estimates of the amount needed in the manufacture of food products for human consumption in the United States and of the amount to be exported. When the market quota was determined, the Secretary estimated the acreage required to produce it. Certificates of two kinds—domestic and export—were then issued to growers, who met the acreage allotment regulations, for that per cent of their estimated crop which corresponded with the percentages derived from the Secretary's estimates of domestic consumption and export needs. A 70¢ certificate was issued for each bushel of wheat within the grower's allocation for domestic consumption, and a 25¢ certificate for each bushel within the allocation for exporting. The cash to redeem the domestic certificates was to come in the first instance from the processor.

The critical language of the statute which controls the liability of processors for the certificates is the following, 7 U.S.C. § 1379d:

> (b) During any marketing year for which a wheat marketing allocation program is in effect, (i) all persons engaged in the processing of wheat into food products shall, prior to marketing any such food product or removing such food product for sale or consumption, acquire domestic marketing certificates *equivalent to the number of bushels of wheat contained in such product* and (ii) all persons exporting wheat shall, prior to such export, acquire export marketing certificates equivalent to the number of bushels so exported. (Emphasis supplied.)

Under an express grant elsewhere in the Act, § 1379j, to prescribe "regulation, governing the acquisition, disposition, or handling of marketing certificates", the Secretary issued this regulation, 7 C.F.R. § 777.11 (1965):

> *Time and manner of acquiring and surrendering certificates.*
>
> (a) *General.* Food processors shall acquire certificates and surrender certificates to CCC as provided in paragraphs (b) and (c) of this section and in the manner specified in § 777.10. The number of certificates acquired by the food processor and surrendered to CCC shall be *equivalent to the number of bushels of wheat used in processing the food products* for which certificates must be acquired and surrendered. Such quantity of wheat shall

be determined and reported to CCC as provided in §§ 777.12 to 777.14 on the basis of the weight of wheat used in processing the food products or by application of conversion factors to the weight of food products obtained in the processing operation. (Emphasis supplied.)

It is the juxtaposition of the underlined words in statute and regulation which frames the principal problem presented in this litigation. Appellants urge that the number of bushels of wheat "contained" in a sack of white flour is not the same as the number of bushels "used" in making it. This results primarily from the fact that roughly 18 percent of the components of a kernel of wheat are made up of so-called bran and germ which go into by-products such as animal feeds. There is the further circumstance that a bushel of wheat as delivered to the miller customarily contains impurities and defective kernels which must be screened out, and moisture which is lost both while awaiting processing and in the course of processing itself.

Appellants attack the formula established by the Secretary for computing the amount of wheat for which the processors must buy certificates. The argument to us is, first, that the statute admits of nothing other than the requirement that the processor buy only as many certificates as there are bushels of wheat physically incorporated in the finished flour; and, second, that, even if bran and germ be not eliminated from this computation, the regulations have unreasonably and arbitrarily limited the permissible deduction for impurities and shrinkage. We deal with these issues in turn.

## II

Appellants insist that the statutory language is so clear as to bar resort to external aids to interpretation. See United States v. Missouri Pac. R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322 (1929), and our own statement of this proposition in Elm City Broadcasting Corp. v. United States, 98 U.S.App.D.C.

314, 319, 235 F.2d 811, 816 (1956). But this is a doctrine which reflects a highly optimistic view of the human capacity to communicate precise meaning by the written word. There are surely occasions where its invocation is justified, particularly where a covert look may indicate that the appeal from one set of words to another is not very illuminating. It is rare indeed, however, that particular words patently preclude all but one meaning; and courts should be slow to spurn such enlightenment as may be available from any authentic source.

We do not believe that the statutory reference to bushels of wheat "contained in" flour in this context is as clear in its signification as appellants assert. It is not wholly idle to believe that perhaps Congress might have been thinking in terms of bushels of wheat "used in" making flour, as the regulation assumes. It would not be a bizarre employment of ordinary speech for a housewife to say that three quarts of cherries were "contained in" her jam, although, when cross-examined about the stems and the pits and so on, she might readily agree that she had in reality "used in" making the jam three quarts of cherries. We think that, contrary to appellants' claim, an ambiguity lurks in this statute which authorizes us to look beyond its four corners for help in resolving this substantial dispute about its meaning.

Our first look, however, is not outside the Act of which Section 1379d(b) is a part. Domestic marketing certificates are provided for in Section 1379c. The Secretary is directed to arrange "for the issuance of domestic marketing certificates for the portion of wheat marketing allocation representing wheat *used* for food products * * *" (Emphasis supplied.) The Secretary is also directed to fix as the value of domestic marketing certificates, the difference between the support level of certificate wheat and the support level of non-certificate wheat. These respective levels as set by the Secretary were $2.00 and $1.30, respectively, leaving the value of a certifi-

cate, as defined in the statute, at 70¢.[1]

The scheme of the statute is that the Secretary was to estimate in advance how many bushels of the annual crop would go into domestic processing. A certificate was to be issued in respect of each bushel in this estimate. A processor must acquire a certificate for each bushel bought by him for processing. The producer of that bushel was paid 70¢ by the Government. If the Government was not to be out of pocket, the processor must pay 70¢ for the certificate.

The District Court was of the view that Congress had been thinking in terms of a rough equivalence between what had to be paid out to the farmers in respect of the certificates, and what would be received from the processors for the certificates. We agree. The congressional plan seems to us to be preoccupied with bushels of wheat moving from farm to market, and not with residues after processing. Congress was at the old stand of assuring farm income and, as always, it was concerned with the source of the support payments. It obviously thought to make the processors a revenue source, and the contribution it expected from them was 70¢ per bushel, not 50¢ as it would be under appellants' theory. This is explicit in many exchanges on the floor in both Senate and House;[2] and it is unmistakable from the Senate Committee report on the 1964 legislation. 1964 U.S.Code Cong. & Ad. News 2142. Characterizing the effect of the proposed legislation as being "to require a certificate on all wheat processed into such (food) products * * *," the Committee also said:

"Wheat for domestic food use, however, would be priced at about $2, including the value of the certificate. This is the level it has been moving at in recent years and the bill would not result in any increase in the price of wheat to flour millers and should therefor by itself have no effect whatsoever on the price paid for bread by consumers." *Ibid*.

This legislative record, in our view, ineluctably leads to a firm impression that

---

1. The phrases "wheat contained in" and "wheat used in" appear in Section 1379f of the Act; and appellants vigorously maintain that their usage in that context confirms the interpretation claimed for them in § 1379d. Section 1379f is concerned with the establishment of conversion factors. It is said that the Secretary, by working back from the weight of the flour to the weight of the wheat required for its manufacture, has violated the command of Congress to do just the opposite; and that this command itself demonstrates Congress's purpose to require certificates only in respect of the residue of wheat physically present in the flour. To adopt the Secretary's interpretation of "contained in," it is further asserted, would render the Section nonsensical. There is evidence, however, that this statute was enacted against the background of conversion factors devised in accordance with the Secretary's approach; and, in the light of this fact, the phrasing of § 1379f may be reasonably read as the Government contends.

2. Typical is the following colloquy between the floor manager of the bill, Senator McGovern, and Senator Morton:

"MR. McGOVERN. The price of wheat to the miller would tend to be held at approximately $2. It would not change the present price level at all. This bill is designed to prevent the price of wheat from dropping, not to raise it.

MR. MORTON. But if someone wanted to buy 1,000 bushels of wheat, he would have to have 1,000 70-cent certificates.

MR. McGOVERN. Yes.

*       *       *       *       *

MR. MORTON. Milling wheat at Chicago today is approximately $2, is it not?

MR. McGOVERN. That is approximately right.

MR. MORTON. So after the bill was passed, the purchaser would still have to pay $2 plus the 70-cent certificate?

MR. McGOVERN. No. The support rate is set today at different levels than it would be in the absence of this bill. What it will be under the bill if passed is a price of $1.30 plus the 70-cent certificate. Today the total of price support and other assistance comes to $2. So we are not changing the price of wheat 1 cent a bushel under the legislation before us."

110 CONG. REC. 4169 (1964).

all persons interested in the legislation, including the millers themselves, were under no misapprehension that, if enacted, one buying a bushel of wheat from a farmer to make flour would have to pay 70¢ for a certificate.[3]

Even without this explicit evidence of Congressional purpose, we would, of course, be slow to reject the Secretary's own reading of a statute which Congress has given him the duty to administer. Administrators are not always right in their divinations of the legislative will, but anyone who is at all familiar with the closeness of the relationship between executive departments and Congress during the consideration by the latter of a change in a major statute administered by the former, knows that their guesses are far from uninformed. In any event, the courts have accorded them a special respect. FTC v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); Power Reactor Development Co. v. International Union, etc., 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); and see especially Judge Prettyman's comment on this matter in California Company v. Udall, 111 U.S.App.D.C. 262, 266, 296 F.2d 384, 388 (1961).

### III

The regulations issued by the Secretary provided alternative methods for determining the quantity of wheat used in processing. One was on the basis of the weight of the wheat used, and the other by the application of conversion factors to the weight of the resulting food products. In the case of the former, the regulations further provided for a deduction of (1) dockage, (2) shrinkage from drying up to 0.6% and (3) wastage. It is alleged that these allowances account for some—but not all—of the transformation which occurs in a bushel of wheat processed into a food product.

Appellants appear to argue that, even if their reading of the statute be wrong, thereby accepting the propriety of including the bran and germ components in the weight for certificate purposes, the Secretary has acted arbitrarily and capriciously in limiting the deductions for these other elements. This is a point which does not seem to be discussed by the District Court in its memorandum opinion, and which was urged somewhat obscurely upon us in brief and argument, perhaps because of the overriding importance of the statutory argument. Indeed, the claim of arbitrariness in this regard in reality stems ultimately from appellants' view of the statute, i. e., that only the residue physically present in the finished product may be made the basis of certificate computation.

Taking it, however, as a separate and independent contention, we are not prepared to say that the regulations are invalid. Dockage is a trade term describing impurities. A sample of wheat about to be sold is sieved, and the percentage of dockage in the sample is deducted from the whole. It is not pretended that this test picks up all the foreign matter, but the remaining sample is then graded in a manner which takes this into account. Price goes according to grade. Thus, the regulations allow the usual weight deduction, leaving other impurities to be reflected in price.

Shrinkage from loss of moisture occurs both during storage and in the

---

3. Appellants argue that, even if some ambiguity in the statute be conceded, the result should still be the same inasmuch as the law is clearly a taxing measure and is, therefore, to be construed most strongly against the Government. See Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917). But the purpose of the statute appears to be to regulate the price of wheat for the benefit of the grower, and the federal power relied upon is the Commerce Clause. The bill was not handled in either chamber as a tax; and the revenue raised is for the achievement of a regulatory purpose and not to contribute to the general funds of the Treasury. Even if considered as a taxing measure, it is unlikely that Congress would fix a 50¢ rate to support a 70¢ outlay.

course of processing. But processing loss is the very nub of the dispute between the parties over the proper reading of the statute; and, once that dispute is resolved in favor of the Secretary, a regulation which makes no allowance for processing loss would be neither arbitrary nor capricious. Appellants, presumably because of their view of the statute, persistently lump the two types of moisture loss together in their argument that the allowance is inadequate, and have made no attempt to differentiate between the two kinds of losses. Thus, the Secretary's contention as to normal shrinkage losses during storage is largely unchallenged, because appellants are proceeding on a different set of assumptions—assumptions which we have rejected in our treatment of the statutory construction argument. In any event, the record does not enable us to say with confidence that the Secretary's allowance by regulation of 0.6 percent for moisture loss is unreasonable.[4]

With respect to wastage, it appears to be undisputed in the record that the regulations do not require marketing certificates in respect of wheat which, because of some flaw in processing, fails to become a food product removed from the plant or marketed as such. And insofar as this claim rests upon the amount of wheat lost in handling and storage, this loss does not appear to be either of such a magnitude or so lacking in relationship to the processing of the wheat as to compel holding the regulations arbitrary.

The judgment of the District Court is

Affirmed.

---

4. A Government affidavit asserts that this allowance was fixed upon after consultation with industry spokesman who advised that it "was adequate to offset any invisible loss occurring during storage in the usual course of operations." An affidavit for appellants, although stating that "trade practice recognizes no limit on moisture loss during storage," does not directly challenge the Government's contention that the allowance is based upon *normal* storage conditions.