**PORT AUTHORITY OF the CITY OF SAINT PAUL, a public corporation**

v.

**The UNITED STATES.**

**No. 21–67.**

United States Court of Claims.

Oct. 16, 1970.

Robert D. Stiles, Minneapolis, Minn., attorney of record, for plaintiff. Johnson & Thompson, Minneapolis, Minn., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

Plaintiff, a governmental subdivision of the State of Minnesota, sues under the Federal Disaster Act to recover $116,000 for the repair of facilities damaged by a 1965 flood. The case is before the court on cross-motions for summary judgment.

Plaintiff owns certain grain storage and barge terminal facilities, as well as the real property upon which the facilities are situated, in St. Paul, Minnesota. The construction of the facilities, which are adjacent the Mississippi River, was financed by the issuance of revenue bonds.

During March and April 1965, the Mississippi River flooded its banks. On April 11, 1965, the President of the United States determined that the flooding constituted a major disaster within the meaning of the Federal Disaster Act [42 U.S.C. §§ 1855–1855g] [1] and so advised the Governor of Minnesota.

On April 26, 1965, plaintiff requested a field survey to determine the extent of the damages to its facilities in order to qualify for Federal assistance under the Act.

In May 1965, Region 4, Office of Emergency Planning,[2] (hereinafter OEP) and the Governor of Minnesota entered into a Federal-State Disaster Assistance Agreement as provided in the Act. The agreement was in the form of a letter dated May 4, 1965, with attachments.

Also during the month of May 1965, plaintiff's property was inspected by representatives of both Minnesota and the United States. It was recommended that a total of $125,350 in estimated repair costs be approved as eligible under the Act.

---

1. Section 1855a provides:

"(a) 'Major disaster' means any flood, drought, fire, hurricane, earthquake, storm, or other catastrophe in any part of the United States which, in the determination of the President, is or threatens to be of sufficient severity and magnitude to warrant disaster assistance by the Federal Government to supplement the efforts and available resources of States and local governments in alleviating the damage, hardship, or suffering caused thereby, and respecting which the governor of any State (or the Board of Commissioners of the District of Columbia) in which such catastrophe may occur or threaten certifies the need for disaster assistance under this chapter [§§ 1855–1855g of this title], and shall give assurance of expenditure of a reasonable amount of the funds of the government of such State, local governments therein, or other agencies, for the same or similar purposes with respect to such catastrophe;"

\*  \*  \*  \*  \*

2. Now the Office of Emergency Preparedness.

Plaintiff's first claim in the amount of $101,400 resulted from the Government's withdrawal of the approval of plaintiff's project application for the repair of two grain elevators and a public scale. At all times relevant to this action they were leased to private interests. The denial was based on an agency rule which provided that publicly-owned facilities leased to private interests were ineligible for assistance. Plaintiff's second claim in the amount of $14,600 grows out of the Government's withdrawal of a provisionally approved application for the replacement of pile clusters at a grain terminal. The denial was predicated on plaintiff's failure to complete the repairs within the time specified in the regulations. The pertinent facts and our conclusions with respect to each claim will be discussed separately.

### I

### *Claim For Repairs to the Leased Facilities*

The Federal Disaster Act gives the President statutory authority to coordinate the activities of Federal agencies in providing disaster assistance. The intention of Congress in providing such aid is found in 42 U.S.C. § 1855, which reads as follows:

> *1855. Declaration of Congressional intent.*—It is the intent of Congress to provide an orderly and continuing means of assistance by the Federal Government to States and local governments in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters, to repair essential public facilities in major disasters, and to foster the development of such State and local organizations and plans to cope with major disasters as may be necessary. (Sept. 30, 1950, c. 1125, § 1, 64 Stat. 1109)

The Act also gives the President broad authority to prescribe rules and regulations necessary and proper to implement the provisions of the Act. Section 1855d provides:

> \* \* \* \* \* \*
>
> (b) The President may, from time to time, prescribe such rules and regulations as may be necessary and proper to carry out any of the provisions of this subchapter [§§ 1855–1855g of this title], and he may exercise any power or authority conferred on him by any section of this chapter [§§ 1855–1855g of this title] either directly or through such Federal agency as he may designate. (Sept. 30, 1950, c. 1125, § 5, 64 Stat. 1110)

Pursuant to this authority, the President by Executive order [3] delegated to the Director of the Office of Emergency Planning the following authority:

> The authority to prescribe rules and regulations as may be necessary and proper to carry out the provisions of sections 3 and 5 of the Act. \* \* \* [42 U.S.C. 1855b and 1855d]

On June 4, 1965, plaintiff sent Minnesota officials a completed "Project Application for Supplemental Federal Financial Assistance," which included $101,400 for the repair of the elevators and the public scale. Plaintiff requested a total of $125,350 to repair the flood damage.

The application form submitted by plaintiff contained a notation at the top of the first page, which read as follows: "Before completing this application, See Instructions."

OEP Circular 4000.5 dated January 1964, is entitled "Instructions To Applicants, Natural Disaster Program." This circular, which was available to plaintiff when it submitted its application, contained detailed rules governing an application for Federal assistance under the Act. The circular is divided into four sections entitled "Eligibility," "Project Applications," "Advances of Funds," and "Preparation of Claims."

---

3. Executive Order No. 10427, January 16, 1953, as amended by Executive Order No. 10737, October 29, 1957. *See also* Executive Order No. 11501 of September 28, 1962, 27 Fed.Reg. 9683.

The categories of work eligible under the Act were defined in detail in Section I, C, of the document. Paragraph 5 of that section stated:

5. *Emergency Repairs and Temporary Replacement of Public Buildings and Related Equipment*

\* \* \* \* \* \*

(b) Costs for emergency repair or temporary restoration of public recreational facilities such as bathing beaches, zoos, parks, etc., and publicly owned buildings leased or rented to private interests are *ineligible*.

On June 18, 1965, plaintiff's application was approved by Minnesota authorities. On July 7, 1965, the Regional Director of the OEP also approved the application and authorized disbursement of Federal funds therefor. Plaintiff had not indicated on its application that the grain elevators and public scale were leased to private interests and at the time the application was approved, the OEP was unaware of that fact.

In accordance with plaintiff's request, the OEP advanced plaintiff 75 percent of the total amount approved on July 14, 1965.

On August 2, 1965, the Regional Director of the OEP informed Minnesota representatives that the OEP had received information that the structures in plaintiff's application were leased to private interests. An investigation was made and in a letter to the Regional Director, dated September 9, 1965, the Adjutant General of Minnesota confirmed the fact that the facilities were leased to private interests. The letter also stated that it was the opinion of the Adjutant General that the facilities were ineligible under the Act. This opinion was based on an OEP rule identical to OEP Circular 4000.5 dated January 1964, Section I, C, 5(b).[4]

On October 12, 1965, the Regional Director withdrew OEP approval of plaintiff's application, and in a letter to the Adjutant General, the OEP requested the State to return the funds advanced the State Treasurer. The letter stated in part: "[We] cannot classify a facility leased for private use as an essential function of the state or local government."

On November 22, 1965, plaintiff returned to the Minnesota representatives the moneys previously advanced and thereupon a refund was made to the OEP regional office.

Plaintiff submitted additional information in support of its request and formally appealed the denial of its application to the Regional Director of OEP, who denied the appeal. On August 8, 1966, that decision was affirmed by the Director of OEP. His decision with respect to the leased elevators and public sale stated: "The facts do not show that the work was performed for an essential facility of the state or local government. The facts reveal that the work was accomplished on Port Authority facilities leased to private interests."

Plaintiff challenges the validity of the OEP eligibility rule on the grounds that the rule is illegal, that it is contrary to the provisions of the Federal Disaster Act, and that the disapproval of plaintiff's application was arbitrary and capricious. In view of the broad congressional grant of administrative authority to prescribe rules and regulations to effectuate the provisions of the Act, we agree with defendant that our scope of review is limited. In a case involving a similar question, the Supreme Court in United States v. Shimer, 367 U.S. 374, 381–382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961) said:

\* \* \* More than a half-century ago this Court declared that "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this

---

4. The letter cited OEP Circular 4000.4, dated August 1963, Section VI, C. 5, (b) b.

court should be of opinion that his action was clearly wrong." * * *

In a number of cases this court has also held that it can invalidate such a regulation only if it clearly contradicts the terms or purposes of the statute. Fix v. United States, 368 F.2d 609, 614, 177 Ct.Cl. 369, 377 (1966); Daniels v. United States, 407 F.2d 1345, 1347, 187 Ct. Cl. 38, 41–42 (1969).

In an effort to meet the heavy burden imposed upon it by these established legal principles, plaintiff argues that the Federal Disaster Act makes no distinction between essential public facilities that are publicly operated and those that are privately leased. Plaintiff also points to the regulations (32 CFR § 1710) promulgated by OEP, contends that the regulations establish the criteria of eligibility, and says that they contain no language precluding privately leased facilities from eligibility under the Act. Plaintiff relies on the following portions of Section 1710.10 of the regulations:

> Federal financial assistance under Public Law 875 shall be limited to protective work and other work for the protection of life and property, debris and wreckage clearance, and emergency repairs and temporary replacement of essential public facilities of States and local governments, including provisions for temporary housing or emergency shelter.
>
> * * * * * *
>
> (c) *Emergency repairs and temporary replacements.*
>
> In providing financial assistance for making emergency repairs to and temporary replacements of public facilities of States and local governments which have been damaged or destroyed, the following criteria shall apply:
>
> (1) Emergency repairs and temporary replacements shall be made only to those facilities the operation of which is essential to health, safety or welfare.
>
> (2) Assistance in making emergency repairs or temporary replacements shall be limited to providing for the resumption of essential public services until such time as permanent repairs or replacements may be made, except when specifically authorized by the Director pursuant to subparagraph (3) of this paragraph.
>
> (3) A Federal financial contribution toward the permanent replacement of a public facility, in lieu of and in an amount no greater than that estimated to be required for the temporary replacement or emergency repair, may be authorized where such permanent replacement will expeditiously permit the resumption of the essential public service provided by the facility.

We find these contentions to be unpersuasive. Although the Act speaks in terms of "essential government facilities," the definition of the term is left to agency discretion. It is also clear that the regulations do not require that assistance be granted to all public facilities. The regulations do not define the term "essential," and the only specific eligibility criteria are contained in Section I of OEP Circular 4000.5 and its predecessors. We do not find, therefore, that the rule contradicts any provision of the statute or the regulations, or the purposes for which the law was enacted.

It is undisputed that the facilities in question were leased to private interests and that, except for one of them, the lease required the lessees to replace damaged facilities. The Regional Director of OEP who initially approved plaintiff's application was unaware that the buildings were leased to private interests and stated that he would not knowingly approve the aid for such purposes, because the approval would have violated agency policy. Moreover, the rule was a general rule adopted for application in the administration of a nationwide program in which the amount of aid that could be granted was limited by the congressional appropriation. Defendant sug-

gests and we agree that, in view of the fact that OEP could anticipate requests for aid in excess of funds available for that purpose, the rule containing a blanket denial of relief for leased facilities was well within the zone of discretion granted to the agency. Under the circumstances, it was not unreasonable for OEP to limit the granting of aid to those State and local government facilities which cannot look to lessees for financial assistance in making the necessary repairs.

■ Plaintiff's principal argument is based upon the fact that the Minnesota Legislature has declared that the "exercise" of any powers of a port authority "shall be deemed and held to be essential Government functions." [Minn.Stat. Ann. § 458.09(1) (1963)]. Plaintiff also relies on an opinion of the Attorney General of the State to the same effect. However, the fact that the facilities in issue were classified as essential public facilities under State law does not per se entitle plaintiff to assistance under the Federal Disaster Act, nor does it invalidate the OEP's eligibility rule, even if we were to find the rule is in conflict with the laws of Minnesota. The Supreme Court has so held. In United States v. Shimer, *supra*, the Court was called upon to determine the validity of a Veterans' Administration regulation, which was in conflict with a Pennsylvania statute. Relying on a provision of the Servicemen's Readjustment Act,[5] which was in all material respects similar to Section 1855d of the Federal Disaster Act, the Supreme Court said: "We think that the Servicemen's Readjustment Act authorized the Veterans' Administrator to displace state law by establishing these exclusive procedures." 367 U.S. at 381, 81 S.Ct. at 1560. *See also* McKnight v. United States, 259 F.2d 540, 544 (9th Cir. 1958) and Clark In-

vestment Co. v. United States, 364 F.2d 7, 9 (9th Cir. 1966).

## II

*Claim for Replacement of Pile Clusters*

Included in plaintiff's claim for disaster relief was an item for the repair of pile clusters adjacent the plaintiff's grain terminal. Plaintiff's application for this particular repair work was at first provisionally approved in the amount of $14,000. It appears that plaintiff expended $14,600 in completing the work, and plaintiff sues for that amount here.

In March 1967, the Regional Office sent a report to OEP's Audit and Fiscal Branch, stating that a report by the Minnesota State Auditor showed that plaintiff had not completed the replacement of the pile clusters within the one-year limitation prescribed by Section 1710.16 of the regulations which provided:

§ 1710.16 Time limits.

Federal assistance extended under the Act shall terminate upon notice by the Director to the Governor of the State or upon the expiration of one year from the date of notification to the Governor of the President's determination that a major disaster exists, whichever is first, except that upon a showing of unusual circumstances, the Director, with the consent of the President, may extend this period: *Provided*, That, upon a showing of the need and with the recommendation of the Secretary of Agriculture, the Director may extend such termination dates, for such purposes and such periods of time as he may determine to be necessary, with respect to disaster relief assistance solely for agricultural purposes.

The one-year period expired on April 10, 1966. Accordingly, the State Auditor

---

5. "Section 504 of the Act provided:
"The Administrator is authorized to promulgate such rules and regulations not inconsistent with this title, as amended, as are necessary and appropriate for carrying out the provisions of this title, and may

delegate to subordinate employees authority to issue certificates, or other evidence of guaranty of loans guaranteed under the provisions of this title, and to exercise other administrative functions hereunder." 367 U.S. 381 n. 9, 81 S.Ct. at 1560 n. 9.

suspended as untimely plaintiff's claim of $14,600 for this work, and the Regional Director of OEP concurred in this action. Plaintiff appealed and submitted a statement of what it considered extenuating circumstances by letter of November 14, 1968. Attached were an affidavit by the Chief Engineer for the Port Authority and plaintiff's lease with the Farmers Union Grain Terminal Association. The grounds presented by plaintiff can be summarized as follows:

(a) The Mississippi River remained above normal water level until approximately July 1, 1965. Therefore, it was difficult, if not impossible, to conduct an adequate inspection of Grain Terminal Number 1 before that date;

(b) following inspection of the damage, it was determined that the Port Authority did not have sufficient funds to repair the damage;

(c) it was not until March 18, 1966, that the Port Authority was advised by its counsel that its lease required it to repair Grain Terminal Number 1;

(d) after estimates were made in June 1966, a month elapsed while the repair contract was bid; and

(e) the repair work was hindered by the severe Minnesota winters and use of the facilities.

After considering the material submitted by plaintiff, the Director of OEP denied plaintiff's final appeal on April 18, 1968. The Director found that plaintiff had not shown that the work had been performed in a timely manner.

In its motion for summary judgment, plaintiff maintains that it had made a sufficient showing of extenuating circumstances to justify an extension of the termination date and that the decision of the Director was arbitrary and capricious.

If the question were before us for a de novo determination, the facts that the Mississippi River remained at high levels until July 1, 1965, plaintiff's shortage of funds, and the hindrance to the repair work by the severity of the Minnesota winters might have persuaded us to disagree with the administrative decision. But as the Supreme Court held in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), to sustain an administrative interpretation of a regulation issued by it, it is not necessary to find that the agency construction is the only reasonable one, or even that it is the result a court would have reached had the question arisen in the first instance in judicial proceedings.

■ Where administrative control has been authorized by Congress, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934).

■ Plaintiff did not learn from its legal counsel that its lease required it to replace the pile clusters until March 18, 1966, about a month before the one-year period expired. There is no explanation for the long delay in ascertaining plaintiff's obligations under the lease. Also, plaintiff waited until April 4, 1966—a few days before the expiration of the one-year period—before plaintiff employed an engineer to inspect the damage and prepare estimates for the repair work. In the presence of these facts, we cannot hold that there was no rational basis for the administrative decision.

For the reasons stated above, defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's petition is dismissed.