NABISCO, INC.

v.

The UNITED STATES.

No. 321–77.

United States Court of Claims.

May 16, 1979.

William H. Allen, Washington, D. C., for plaintiff. Gary L. Reback and Covington & Burling, Washington, D. C., of counsel.

Richard J. Webber, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Thomas V. Conway and James R. Walczak, Department of Agriculture, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KASHIWA, Judge.

## OPINION

COWEN, Senior Judge.

The plaintiff, Nabisco, Inc., is a vertically integrated commercial baker which mills flour from wheat and produces baked goods from the flour and other ingredients for national sale. Nabisco sues for $1,344,-341.16 alleged to be due to it under a brand-name contract with the Defense Personnel Center. Nabisco's entitlement to this sum under its contract is not in dispute; the Government, however, has withheld payment in that amount in satisfaction of another claim: an alleged overpayment to Nabisco of refunds administered as part of the termination of the wheat certificate program established by the Food and Agriculture Act of 1962. Both parties have moved for summary judgment, since there are no disputed issues of material fact. Adjudication of the plaintiff's claim requires an examination of the wheat certificate program, of the Congressional actions which terminated[1] the program, and of the regulations issued and procedures followed by the Secretary of Agriculture in carrying out the Congressional mandate. On the basis of that examination, we conclude that plaintiff is not entitled to recover.

## I.

The wheat certificate program was established by the Food and Agriculture Act of 1962, Pub.L. 87–703. The purpose of the Act was to provide a new way to finance Federal price supports granted to growers of wheat. The Government wished to guarantee wheat farmers who complied with Federal quotas a minimum price of $2 a bushel; those farmers were given certificates, redeemable for cash at face value, for that portion of their crop which was necessary for domestic consumption. Growers received these certificates in addition to the proceeds from the sale of the wheat on the open market. *See Morrison Milling Co. v. Freeman,* 124 U.S.App.D.C. 334, 365 F.2d 525 (1966), *cert. denied* 385 U.S. 1024, 87 S.Ct. 741, 17 L.Ed.2d 672 (1967). The fund to redeem the certificates was created out of money paid by persons who processed wheat into food products. Such persons were required to purchase from the Secretary of Agriculture certificates for each bushel of wheat contained in those food

---

1. Although Congress technically only "suspended" the certificate program in 1973, we shall use the word "terminate" throughout this opinion.

products. The food products could not be marketed or "removed for sale or consumption" [7 U.S.C. § 1379d(b)] until those certificates had been purchased (or, under an alternative payment scheme, until an undertaking to purchase the certificates within 45 days of processing the wheat had been filed [7 U.S.C. § 1379d(c)]).

7 U.S.C. § 1379d(d) defined "food products" to mean:

> * * * flour * * *, semolina, farina, bulgur, beverage, and any other product composed wholly or partly of wheat which the Secretary may determine to be a food product. * * *

7 U.S.C. § 1379j authorized the Secretary of Agriculture to promulgate additional regulations, if necessary, to administer the program. The regulations issued under this authority expanded and detailed the definition of "food product":

> (b) "Food product" means:
>
> (1) Any product processed in whole or in part from wheat, irrespective of whether such product is actually used for human consumption, except such products as are defined herein as non-food products. Such food products shall, except as provided in paragraph (c)(3) of this section, include but not be limited to the following:
>
> (i) Flour, as defined herein. (See §§ 777.18 and 777.19 for special provisions on flour second clears which are not used for human consumption.)
>
> (ii) Wheat which is boiled, steeped, or commercially sprouted.
>
> (iii) Any breakfast cereal.
>
> (iv) Any beverage.
>
> (v) Cracked wheat (wheat grits), ground wheat, crushed wheat, rolled wheat, pearled wheat, or flaked wheat (toasted or untoasted, other than breakfast cereal) or such other similarly processed wheat as may be designated by the Administrator, except to the extent that the total product of the wheat processed is used in or marketed as animal feed or other nonfood product. To qualify as ground wheat not more than 70 percent of such total product shall pass through a No. 8 sieve, and

not more than 30 percent of such total product shall pass through a No. 20 sieve. [7 C.F.R. § 777.3(b) (1977)].

Only the person in the marketing chain who actually dealt with wholly unprocessed wheat (ordinarily, that is, the miller) was required to purchase certificates; it was the clear intent of the scheme, however, that the additional cost was to pass along the chain of commerce to the ultimate consumer. *See, e. g.,* 119 Cong.Rec. 18326 (1973) (remarks of Senator Bayh).

In 1972 and 1973 the price of wheat began to rise sharply as a result of large export sales, but Government price controls prohibited bakers and marketers of wheat food products from reflecting the increased cost of wheat in their retail prices. The bakers sought legislative relief, and Congress responded by repealing the wheat certificate program in the Agricultural and Consumer Protection Act of 1973, Pub.L. 93–86. The termination date of the certificate program was set at June 30, 1973, some 40 days *before* the effective date of the Act. The retroactive termination was intended to forestall market disruptions that might have resulted if the termination date were known far in advance; it was felt that purchasers and processors of wheat would doubtless delay new purchases until termination, since they would not have to buy certificates for post-termination sales.

It is clear from the legislative background of the 1973 Act that Congress' primary intent in repealing the certificate program was to benefit bakers and keep the baking industry competitive by lowering flour prices. This, Congress felt, was the best way to control the rising cost of bread to the consumer. Some legislators pointed out that smaller bakers were harder hit by the price squeeze than large ones, but the provisions were intended to benefit every baker, large and small. *See* 119 Cong.Rec. 18326–27 (1973) (remarks of Senators Dole and Taft).

Section 1379g of the Act granted the Secretary of Agriculture authority to provide transition relief if he deemed it necessary:

§ 1379g. *Authority to facilitate transition.*

\* \* \* \* \* \*

(c) The Secretary is authorized to take such action as he determines to be necessary to facilitate the transition from the certificate program provided for under section 1379d of this title to a program under which no certificates are required. Notwithstanding any other provision of law, such authority shall include, but shall not be limited to the authority to exempt all or a portion of wheat or food products made therefrom in the channels of trade on July 1, 1973, from the marketing restrictions in subsection (b) of section 1379d of this title, or to sell certificates to persons owning such wheat or food products made therefrom at such price and under such terms and conditions as the Secretary may determine. Any such certificate shall be issued by the Commodity Credit Corporation. Nothing herein shall authorize the Secretary to require certificates on wheat processed after June 30, 1973. [7 U.S.C. § 1379g(c) (Supp. V, 1975)].

Congress apparently foresaw that the retroactive termination of the program might leave many persons in possession of certificate-paid wheat for which no certificate should have been purchased. To alleviate this problem, the Secretary promulgated transition relief regulations which provided in part:

(a) *General.* It has been determined necessary to facilitate the transition from a program requiring marketing certificates to be acquired by food processors to a program under which no certificates are required, by providing that no certificates need be acquired by food processors as to certain wheat processed into food products prior to July 1, 1973, as described in paragraph (b) of this section.

(b) *Type of relief.* (1) Except as provided in paragraph (b)(2) of this section, transition relief shall be provided for wheat processed into food products, as follows:

(i) Flour or other food products in inventory as of 11:59 p. m. local time June 30, 1973, in the processor's plant and such food products which the processor owns and has in storage in a warehouse as of such time. [7 C.F.R. § 777.21(a) and (b) (1977)].

A "food processor" was, according to 7 C.F.R. § 777.3(f) (1977), simply "any person who processes wheat into a food product."

On September 25, 1973, Nabisco filed processing reports for the last processing period under the old program and applied (under the provisions of the transition regulations) for a refund for food products held in inventory on the termination date. The claim for refund encompassed in part:

Food products (cookies, crackers, and snacks processed in part from wheat) owned by the processor and in storage at the Processor's Bakery, distribution warehouse or in route thereto from Processors Bakery as of 6/30/73.

The Government granted the refund claim. Some time later, the Department of Agriculture wrote to Nabisco, demanding the repayment of $1,344,341.16, the amount of the refund given for the cookies, crackers, and snacks in Nabisco's inventory. The Department claimed that these products were not food products which had been processed from wheat; these foods were processed from flour, not directly from wheat. Therefore, any refund made with respect to them had been erroneous. When Nabisco declined to comply with the Department's demand, payments due Nabisco on another contract were withheld pursuant to 4 C.F.R. § 102, the Federal Claims Collection Standards. After an unsuccessful proceeding before the General Accounting Office, Nabisco brought this suit.

## II.

Central to the resolution of this dispute is the Department of Agriculture's interpretation of its regulations defining "food product." The agency has interpreted the words "food product processed from wheat" to mean that the food product must be processed *directly* from wheat—that is,

wheat must go into one unitary process and the food product must emerge as the result. As we shall see below, this interpretation is the agency's way of drawing a line in the chain of food production beyond which foods will no longer be deemed to be "processed from wheat" for the purposes of the certificate program. The line is the effectuation of the perceived Congressional intent to limit certificate liability to foods which are not too remote from the wheat grower in the channels of production. Under this interpretation, flour is clearly a "food product processed from wheat," since it is simply the result of grinding wheat. According to the agency, however, cookies, crackers, and snacks are not "food products processed from wheat" because their manufacture begins with flour (itself a food product) and entails mixing the flour with other products as well as baking. There are too many intermediate steps between the kernel and the cookie, says the agency, for the cookie to be "processed from wheat."

■ Our examination of this interpretation is necessarily a limited one. In *Port Authority of Saint Paul v. United States,* 432 F.2d 455, 193 Ct.Cl. 108 (1970), we cited Supreme Court decisions which have established the following principles for application in the review of an agency's interpretation of its regulations:

    * * * to sustain an administrative interpretation of a regulation issued by it, it is not necessary to find that the agency construction is the only reasonable one, or even that it is the result a court would have reached had the question arisen in the first instance in judicial proceedings.

    Where administrative control has been authorized by Congress, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. * * * 432 F.2d at 461, 193 Ct.Cl. at 120.

*See also, Kantor v. United States,* 205 Ct.Cl. 1, 7 (1974). The Secretary has received a wide grant of discretionary authority from the statute, and we need only find that he has interpreted the regulations issued under that authority in a rational manner. And, of course, the interpretation must be within the authority granted by the statute, and must not expand the regulation beyond its reasonably ascertainable scope. *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977 (2d Cir. 1951).

■ Our examination of the regulation, its interpretive history, the statutory background, and the intent of Congress, together with a consideration of the competing equities, leads us to conclude that the administrative interpretation in this case is a classic example of difficult line-drawing that falls within an agency's special expertise and discretion. Although the interpretation has not been applied in a completely uniform fashion, we find that it is reasonable, supported in law and fact, and implemented in a fairly consistent way. More than this we cannot hope for in a factually difficult area. Therefore, we affirm the agency interpretation and reject the plaintiff's claim.

### III.

■ By repealing the certificate program, Congress intended to benefit bakers. This much is clear from the legislative history. What is not so clear is *which* bakers were the intended beneficiaries, and exactly how they were to be benefited.

During the Senate debates over the 1973 Act, several senators expressed concern over the plight of the small baker in the current flour market. Senator Bayh's remarks may be taken as typical:

    * * * many small independent bakers across the country have been squeezed drastically between rapidly rising flour costs—due largely to the Russian wheat deal—and prices that cannot be raised because of competition from the huge chain bakeries which can sustain operations in situations a small independent baker cannot.

    *    *    *    *    *    *

    The way to preserve a competitive baking industry, to keep bread prices from rising and to eliminate a regressive tax

without hurting the farmer one bit, is to repeal the bread tax, so that the flour prices in the competitive milling industry will fall. * * * [119 Cong.Rec. 18326 (1973)].

Other senators expressed similar sentiments. However, it appears that Congress was willing to aid *all* commercial bakers, large and small, in order to get the baking economy back on its feet.

The Senators' remarks about small bakers are not totally without significance, however. They demonstrate Congress' intent to assist the bakers *by lowering their flour prices,* not by granting any additional aid or relief, since the vast majority of small bakers purchase their wheat in the form of flour from millers. Nabisco is one of only two or three integrated bakers in the country that produce finished baked goods from flour which they grind themselves from wheat. Nabisco thus stands before the court in a dual capacity, and it is important to keep separate the benefits which accrue to it as miller and the benefits which redound to it as baker.

Viewed in this light, the Congressional intent as it applies to Nabisco becomes clearer. Nabisco as a miller is entitled to a refund for flour held in inventory on June 30, 1973. Nabisco as baker will benefit because the cost of flour for the wholly integrated business operation will be less. Nabisco as baker is *not* entitled to benefit from the refund program for its cookies, crackers, and snacks in inventory on June 30, 1973, because Congress did not contemplate that bakers in general would be entitled to transition relief. In the ordinary course of manufacture as understood by Congress, the baker who produced cookies, crackers, and snacks was not directly involved at all in the certificate program. He was engaged in baking from flour, not in processing wheat, and the wheat he used had been sold to him by a miller whose certificate liability depended on that act of selling. Thus, Congress envisioned a scheme wherein the manufacture of cookies, crackers, and snacks occurred after certificate liability had already been settled.

The cookies, crackers, and snacks in Nabisco's inventory on June 30, like similar products in the inventories of other bakers at that time, were manufactured from higher-priced, certificate-paid flour. Under the Congressional termination plan, no other baker could claim a refund on the higher-priced flour in such products, because the flour had already passed into the stream of commerce, out of the processor's hands and out of the certificate program. Permitting Nabisco a refund on those products would, in effect, grant it a program termination date earlier than June 30 because its unitary operation embraced more of the production process than other milling operations did. The Secretary's decision to exclude cookies, crackers, and snacks from the definition of "food products" insures that all manufacturers of those products will be treated equally with respect to the termination date. Therefore, the agency's interpretation of its regulation accords more nearly with the Congressional purpose.

## IV.

There is a further reason why Nabisco should not be permitted to retain the refund granted it on its inventory of cookies, crackers, and snacks. Such a retention would constitute a windfall for the company, because the extra revenue would be the result of the application of conceptually inconsistent treatments to the beginning and end of the certificate program. At the time the program began in 1964, Nabisco's milling operation was required to purchase certificates for wheat processed into food products on or after July 1, 1964 [7 C.F.R. § 777.4(a) (1965)]. The Secretary interpreted this regulation to mean that only wheat which entered the food processing chain after that time need be covered by certificates. Flour and other food products already in inventory were exempted from the certificate requirement, even if the flour was later used to produce other food products (such as the cookies, crackers, and snacks at issue here). If Nabisco's principal contention (that these products are "processed from wheat") is adopted as a correct

interpretation of the regulations, then its baking operations would have been "processing wheat into food products" when cookies were made from flour in inventory on July 1, and the wheat so processed would have been required to be covered by certificates. The Department did not impose this liability, however, because its definition of "processing wheat into food products" did not extend so far. Nabisco benefited from this narrow interpretation, since it did not have to purchase certificates for the flour held in inventory when the program began. Now, after the termination of the program, Nabisco wishes to *expand* the definition of "processing wheat into food products" as far along the production chain as possible; such a definition will thereby maximize the amount of wheat on which it may claim a refund. We think, however, that the term should be applied consistently at both ends of the program to produce a consistent result, and that defendant correctly ruled that Nabisco was not "processing wheat into food products" when it made cookies from flour.

■ Nabisco objects to this analysis, claiming that nothing in the statutory scheme demands that the beginning and the end of the certificate program share conceptual symmetry. It is true that no legislative act mandates this result. We merely hold that where an agency interpretation appears rationally to further a stated Congressional objective, it should be assumed that Congress intends that such an interpretation is to be applied consistently wherever possible. Congress did intend to grant financial relief to bakers, through lower flour prices, but it also intended that its relief scheme be administered uniformly and equitably.

We find further support for the agency's interpretation in the timing of Nabisco's wheat certificate purchases. The parties have stipulated that:

During the life of the Wheat Certificate Program, Nabisco consistently paid for its wheat certificates based upon the point when it milled wheat into flour rather than the point when it manufactured flour into cookies and crackers. [Defendant's Brief at 17.]

Nabisco argues strenuously that the timing of its purchase of the certificates is irrelevant, because it is clear that flour was a food product, irrespective of the status of cookies, crackers, and snacks. This argument, however, actually favors the Government's position, because the liability does not arise or become final when the food product is *created;* it becomes final when the food product is "removed for sale or consumption from the processing plant." 7 C.F.R. § 777.11(b) and (c) (1977). Such a removal terminates the processing chain and establishes certificate liability. No *further* liability arises if the food product (flour) is afterwards processed into other foods, since the wheat has already been processed and the certificate paid for.

A somewhat analogous situation is presented by the processing of wheat into alcoholic beverages, which is specifically covered by the regulations. 7 C.F.R. § 777.11(e) (1977) states, in part:

(e) *Beverage distilled spirits.* In the case of a food processor who ages beverage distilled spirits which he has manufactured from wheat, the beverage distilled spirits are deemed to be removed from the processing plant for consumption for the purpose of these regulations when the spirits are placed in barrels for aging. * * *

This regulation states that the "processing" of wheat ends after the initial treatment of the wheat, not after the final product is ready for use. Nabisco is correct in saying that it *had* to pay for its certificates when the wheat was milled into flour, but the conclusion only fortifies the justification for that compulsion: the fact that, for the purposes of the certificate program, the processing of the wheat is at an end after the completion of an intermediate step in the manufacture of what might otherwise be considered a "food product."

■ The parties have devoted a considerable amount of argument to comparing the Department's treatment of Nabisco's cookies, crackers, and snacks with its treatment

of self-rising flour, breakfast cereals, dry cake mixes, and dry cookie mixes. These foods, all of which consist of wheat flour mixed with various other ingredients, were classified as "food products processed from wheat" by the Department and certificate refunds were granted without question.[2] The Government has attempted to justify this treatment on various grounds, none of which is wholly convincing. The Government first attempted to show that the flour in these products was chemically recoverable, while the flour in cookies, crackers, and snacks was not; even if this were true (and the plaintiff argues that it is not), it is clear from the record that no chemists or other scientists took part in the decision to allow or disallow refunds on these products. In any case, the chemical recovery of the flour is of doubtful relevance to the Congressional intent to aid bakers by lowering flour prices. The Government also argues that the flour in the dry mixes was granular, but the flour in cookies, crackers, and snacks was not. Nabisco showed that the granular nature of the mixes was physically unrelated to the granular nature of flour, so the Government's attempt to classify refundable food products according to "the way the cookie crumbles" is also unpersuasive. Finally, the Government suggests that the refund program was aimed at millers, not at bakers; while this argument carries weight, it does not provide a complete answer to the question before us.

These arguments are all justifications for a distinction drawn by the administrative agency in the course of carrying out its statutorily assigned function. The agency was charged with developing a rational scheme to control the refund of wheat certificate money in connection with the termination of the program. The performance of that duty required the Secretary to define the term "food product processed from wheat"—and he decided that foods which had been manufactured from flour, mixed with other ingredients, and baked, leaving no further transformations to be performed before consumption, could not justifiably be said to have been "processed from wheat." He could have chosen to draw the line elsewhere, saying (for example) that adulteration of the wheat with any other substance terminated the "processing," or that any food containing wheat, however small the amount, qualified for the refund. Any such line would be open to criticism. This line-drawing, however, is precisely the task for which administrative agencies, with their special expertise and experience, are peculiarly suited to perform effectively; and it is in deference to that experience and judgment that courts refuse to disturb such determinations except when they are shown to be arbitrary. Here, the indicia chosen by the Secretary seem rational and appropriate, and afford a reasonable basis for the difference in treatment: cookies, crackers, and snacks, which have been baked and require no further processing before consumption, are too far down the processing chain to be deemed "processed from wheat," while dry mixes, which are still not ready for human consumption, are properly so regarded. Even if the court itself might have drawn a different line had the matter been left to us, the Secretary's action was clearly within the scope of discretion granted him by the statute.

The plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

---

**2.** Nabisco's argument that the granting of refunds for these products and the denial of refunds for cookies, crackers, and snacks deprived it of the equal protection of the laws by effecting the unequal imposition of a tax (*see, e. g., Township of Hillsborough v. Cromwell,* 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946)) fails for the simple reason that (in spite of its popular appellation of "bread tax") the wheat certificate program was not a tax. *Morrison Milling Co. v. Freeman, supra,* 365 F.2d at 529 n. 3.