**TEXTRON, INC., BELL HELICOPTER TEXTRON DIVISION, Plaintiff,**

v.

**Honorable Brock ADAMS, Secretary of Transportation, Admiral John B. Hayes, Commandant of the Coast Guard and Aerospatiale Helicopter Corporation, Defendants.**

**Civ. A. No. 79–1749.**

United States District Court, District of Columbia.

May 30, 1980.

John W. Douglas, Jerome Ackerman, Washington, D. C., for plaintiff.

Patricia J. Kenney, Asst. U. S. Atty., Eldon H. Crowell, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This matter is before the Court on defendants' motion to dismiss, or in the alternative, for summary judgment.[1] Plaintiff, the Bell Helicopter Division of Textron, Inc. (BHT), filed this action in 1979 to seek the Court's review of alleged illegalities that occurred in the award by defendants, the Secretary of Transportation, and the Commandant of the United States Coast Guard (Coast Guard) of a government contract to intervenor-defendant, Aerospatiale Helicopter Corporation (AHC).[2]

The plaintiff originally urged the Court to order the Coast Guard and AHC to suspend performance on this contract, which provides for the procurement, *inter alia*, of 90 "short range recovery (SRR) helicopters," and which has a total value of approximately $215 million. In light of the dispositive motions filed, the Court must determine whether to set aside the contract award which would, in turn, require the Coast Guard to reevaluate the offers submitted by AHC and BHT.

BHT challenges the procurement award on three grounds:

First, the Coast Guard failed to comply, as required, with the Buy American Act in determining to award the contract to Aerospatiale. Second, contrary to procurement requirements, the procured helicopter differs substantially from the Aerospatiale helicopter that was flight test-ed by the Coast Guard. Third, the contract is invalid either because the price escalation provisions contemplate the use of domestic components, whereas Aerospatiale plans to use substantial foreign components, or because the contract's use of domestic price indices to apply to major foreign components is improper.[3]

Based on a review of the voluminous record that exists, the authorities to which the Court's attention has been directed, oral arguments of the parties and the substantial performance on the contract, the defendants' motion for summary judgment will be granted.

### I. Background

A discussion of the foundation of this action is essential to a fuller understanding of the case. By Solicitation No. CG–80513–A, dated March 17, 1978, the Coast Guard issued its contract solicitation or request for proposals (RFP) (hereinafter "The Solicitation") for a multi-year, fixed price contract for the procurement of the following: 90 SRR helicopters, only the first year quantity of which was to be funded and was to be ordered immediately; a reliability assurance warranty; training of maintenance personnel; training of instructor pilots; and services of contractor employees knowledgeable in the operation of the aircraft. Taken together according to the Solicitation, these items comprise the SRR Helicopter System.[4]

---

1. Other pending motions need not be reached in view of the Court's ruling this date. References will be made, where appropriate, in this text to the initial submissions since all parties rely primarily on those filings.

2. AHC was granted leave to intervene as a party defendant.

3. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction and Ancillary Relief, at pp. 1–2 [hereinafter *Pl.Mem.*].

4. *See* "U. S. Coast Guard, Short Range Recovery (SRR) Helicopter—Cost Instructions," Appendix I, at 8, Opposition of Intervenor—Defendant to Plaintiff's Motion for a Preliminary Injunction, Ex. 2, at 8. [hereinafter *AHC Opp.*]. Short range recovery, as the Coast

Guard defines the phrase, consists of those missions, i. e., search and rescue, enforcement of laws and treaties, and marine environmental protection, which are executed within that portion of the maritime region which extends from the shoreline to 150 nautical miles seaward. To fulfill these responsibilities primary reliance has been placed on the Sikorsky (SIK) HH–52A helicopter, which will be replaced by the aircraft selected in the Solicitation presently before the Court. Federal Defendants' Motion to Dismiss, or in the alternative, for Summary Judgment [and In Opposition to Plaintiff's Motion for a Preliminary Injunction], App. 5A, Thorsen Aff. ¶ 5. [hereinafter *USCG Mem.*]

The Solicitation had its genesis in November, 1973, when the Coast Guard initiated a planning effort to evaluate the continuing effectiveness of its aging fleet of Sikorsky HH–52A helicopters. In 1975, an economic analysis of that helicopter system reported "that it was costing the Coast Guard more to operate the HH–52A than it would to procure and operate a new SRR system." *USCG Mem.,* App. § A, Thorsen Aff. ¶¶ 5–10. In July, 1977, the Department of Transportation approved the Coast Guard's plan for the replacement of the HH–52A system, from which the instant Solicitation was derived.

The Coast Guard received three offers for the development of the replacement SRR Helicopter System. The companies that submitted offers and proposed SRR "candidates" were plaintiff BHT, which offered its model 222C helicopter; intervenor-defendant AHC, which offered its model SA 366, and Sikorsky (SIK) which offered its model S–76. The Sikorsky offer was later withdrawn, leaving AHC and BHT as the sole competitors for the contract.

In the spring of 1979, both AHC and BHT submitted their "Best and Final Offers." These offers were then reviewed by a Source Evaluation Board (SEB)[5] which considered the technical and cost data relating to each offer, including data obtained from a flight evaluation program involving helicopters from which the offerors' SRR candidates were to be "directly derived," and upon a "Buy American Act" determination by the contracting officer.

According to the Affidavit of Howard B. Thorsen, Captain, USCG and Chief, Aeronautical Engineering Division, Department of Transportation and Chairman of the Source Evaluation Board, three criteria were applied in the evaluation of the proposal submitted. Of greatest importance was technical/program suitability, which contained four subparts: a) mission capability; b) design quality; c) logistics support; and d) test, demonstration and qualification program. Second in importance was cost, including contract price and relative life cycle, and the third criterion was management. The Solicitation stated:

> The responsible source selected for award will be chosen on the basis of its proposal being . . . most advantageous to the Government, price and other factors considered. Factors other than price alone will be given paramount consideration during the evaluation and source selection procedure. Thus, submission of the lowest fixed price proposal will not itself assure award. In addition, a proposal meeting minimum requirements with the lowest price may not be chosen for award if a higher price proposal contains significantly greater technical merit to justify the additional expenditure.

When these evaluation factors were applied to the AHC and BHT offers, the SEB reported to the SSAC that the AHC offer was "significantly superior" to BHT's candidate on the sub-criteria of "mission capability" and "substantially superior" to BHT's candidate on the sub-criteria of "design quality." These two sub-criteria were the first and second most important elements of technical/program suitability, which itself was the most important principal criteria for evaluation, and were the only two sub-criteria to be evaluated on a "meet or better" basis.

On June 11, 1979, the SSAC reported that it had reviewed and analyzed the findings contained in the SEB report, and concurred

---

**5.** The Helicopter Selection Plan approved by DOT in 1977 established the formal evaluation procedure to be used in the SRR Helicopter procurement. To execute this procedure the plan called for the establishment of three groups: the Source Evaluation Board (SEB); the Source Selection Advisory Council (SSAC); and the Source Selection Official (SSO). The SEB was responsible for direction and control of the evaluation of the proposals submitted; teams of specialists in 18 separate disciplines participated in the technical evaluations of the offers. The SEB's technical evaluation report would be sent to the SSAC, which acted as the SSO's staff and advisor. The SSO, the Deputy Secretary of Transportation, was the official who would make the final source selection decision for procurement of the SRR Helicopter System.

in the SEB's conclusion that the AHC candidate was technically superior to the BHT Aircraft. On June 14, 1979, the SSO made the final determination and the Coast Guard awarded the contract to AHC whose bid totalled $214,775,412. The only other, submitted by BHT, was for $215,827,500,-000, which was approximately one-half of one percent higher than the AHC offer. Following the contract award, on June 20, 1979 the Coast Guard held a "debriefing" at which time the various factors and determinations used in the source selection procedure were explained to BHT. *See USCG Mem.*, App. § A, Thorsen Aff. ¶¶ 12, 15, 17, 19–21, 30–35, 37–39, 41, Ex. 7, 16.

Dissatisfied with certain of the explanations it received, BHT filed a protest of the contract award with the Comptroller General[6] on June 22, 1979 and instituted the instant action on July 6, 1979. Subsequently, on December 21, 1979, the General Accounting Office (GAO) denied BHT's protest.

It should be noted that BHT was presumably pleased with the Coast Guard's conduct up until the contract award was made, as reflected by a letter from BHT's president, J. F. Atkins to the Commandant of the Coast Guard:

> The Coast Guard has conducted this competition in a very professional manner with great emphasis on fair competitive procedures.

Thorsen Aff. ¶ 28 and Ex. 14. BHT's Proposal Manager also acknowledged the integrity of the Coast Guard's contracting process:

> Bell wishes to compliment the Coast Guard on the professional manner in which it has handled all dealings with Bell from the initial visit to an air station seven years ago through the tour of all air stations in the summer of '77, and the proposal competition. Regardless of the outcome rest assured that we will respect

your decision and continue to support your operation.

Thorsen Aff. ¶ 29 and Ex. 15.

## II. Defendants' Motion to Dismiss

■ Both the Coast Guard and AHC move to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim for relief, claiming that BHT lacks standing to bring this suit.

Despite arguments to the contrary, BHT, as a disappointed bidder, does have standing. A line of cases decided since *Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App. D.C. 371, 424 F.2d 859 (1970) acknowledge that one may, in addition to seeking GAO review pursuant to 4 C.F.R. § 20.10, challenge the award of a government contract. However, the narrow scope of judicial review is limited to those standards expressed in *M. Steinthal & Co. v. Seamans*, 147 U.S. App.D.C. 221, 455 F.2d 1289 (1971) and *Wheelabrator Corp. v. Chafee*, 147 U.S.App. D.C. 238, 455 F.2d 1306 (1971), namely, that the procurement official's decision on matters committed to his/her discretion had no rational basis or that the procedure was prejudicial and violated the applicable statutes and regulations. *See Kentron Hawaii, Ltd. v. Warner*, 156 U.S.App.D.C. 274, 480 F.2d 1166 (1973); *Blackhawk Heating and Plumbing Co. v. Driver*, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970). As Judge Harold Leventhal so eloquently stated in *M. Steinthal & Co.*, 147 U.S.App.D.C. at 230–31, 455 F.2d at 1298–99:

> The above discussion illuminates our concern with the responsibility of courts to consider the totality of the administrative process in their review of agency action. Such an approach would serve to ensure the requisite judicial deference to well-reasoned judgments of agency officials acting within the confines of their

---

**6.** The Comptroller General is authorized to review an award or proposed award involving an agency of the federal government whose accounts are subject to settlement by the General Accounting Office. 31 U.S.C. §§ 71, 74. Regulations implementing this authority grant an interested party, e. g., a disappointed bidder for a government contract, the right to challenge an award or proposed award and obtain a ruling as to its propriety under the applicable law or regulations. 4 C.F.R. § 20.

statutory delegated authority and their own agency regulations. In the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate and enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise 'action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available.' (citation omitted)

Quoting from the decision in *Calcutta East Coast of India and East Pakistan/USA Conference v. Federal Maritime Commission*, 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968), the court in *M. Steinthal & Co.*, 147 U.S.App.D.C. 221, 231, 455 F.2d 1289, 1299, reiterated the familiar cornerstone concerning judicial review of agency action:

A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members. Judicial intervention must, instead, be rested upon a demonstration that the agency action has transgressed the statutory boundaries.

Two rationales support this limited approach to judicial review of government procurement contracts: first, there is a strong public interest in avoiding disruptions in government procurement which often "are vital to the functions performed by the sovereign," *Blackhawk Plumbing*, 140 U.S.App.D.C. at 31, 433 F.2d at 1141; and second, these challenges present the court with multiple technical statutes and contract specifications which often require prompt judicial resolution and reconsideration of the agency's determinations. *M. Steinthal & Co.* Upon this foundation courts have imposed the heavy burden that a disappointed bidder must meet before a court will overturn an agency's determination relating to a procurement contract.

The Coast Guard's position is further buttressed by the GAO's denial of BHT's protest on the merits. Although the December 21, 1979 decision by the Comptroller General of the United States does not echo, in every instance, the Coast Guard's reasoning, the GAO found the award to AHC to be reasonable and consistent with the mandates of the applicable procurement statutes and regulations. *See Bell Helicopter Textron*, B–195268, Dec. 21, 1979 at 1–4. Moreover, a degree of deference should be given to the GAO's denial of the protest in light of its expertise in the procurement arena:

A court's reluctance to interfere with the executive procurement process should be especially strong where, as here, the General Accounting Office has made a determination upholding the procurement officials on the merits.

*M. Steinthal & Co.*, 147 U.S.App.D.C. at 236, 455 F.2d at 1304.

The crux of the Coast Guard's opposition lies in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) which held that § 10 of the Administrative Procedure Act, (APA), 5 U.S.C. § 701 *et seq.* does not confer an independent grant of subject matter jurisdiction.[7] While the thrust of *Califano v. Sanders* is very much alive, the facts of this case and especially the Buy American Act claim, 41 U.S.C. § 10a–d, bring the instant litigation beyond the pale of the APA. Nor do the more recent Supreme Court of the United States decisions on standing require a different result despite their more delineated and seemingly more rigorous requirements. *See Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1976). This circuit recently examined the degree of injury required to confer standing in another context and

7. Although somewhat less energetic than in its original papers, defendant AHC still argues that BHT lacks standing to challenge an antici-

patory breach by AHC, the injury being too speculative. *See AHC Opp.* at p. 25.

found no causal connection between the injury alleged and challenged action in *Winpisinger v. Watson*, —— F.2d ——, No. 80–1160 (D.C.Cir., April 10, 1980). Here, however, there is a justiciable controversy and injury which BHT has standing to raise. Accordingly, the motion to dismiss on these grounds is denied.

### III. Defendants' Motion for Summary Judgment

Both the Coast Guard and AHC contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law pursuant to Fed.R.Civ.P. 56. BHT opposes the motion by incorporating many of the same arguments raised in support of its Motion for a Preliminary Injunction; in sum, that the contract award was not in accordance with law. While BHT initially filed a motion for the Court to order certification and filing of the complete administrative record, that motion was held in abeyance pending the outcome of the instant motion. After minute absorption of thousands of pages of record, including an unusual number of affidavits submitted by all of the parties attached to copious pleadings, and two oral arguments, the Court is persuaded that the matters pertinent to the contract award are fully before it for consideration.

■ In opposing the motion for summary judgment, BHT contends that the Coast Guard's Buy American Act determination was contrary to law. The Court disagrees, finding no basis to set aside the award on this ground. Nor does the GAO's further embellishment on the Buy American Act determination alter the ultimate result.

The Buy American Act, enacted in 1933, 41 U.S.C. § 10a–d, is one of a number of "example[s] of Congressional efforts conditioning the terms of government procurement contracts in order to promote national, social, or economic standards or goals

that in themselves had no immediate relevance to supplying the particular procurement need." H. Leventhal, *Public Contracts and Administrative Law* 52 A.B.A.J. 35, 36 (1966). The Act was designed during the Depression as a device "to foster and protect American industry, American workers and American invested capital" 76 Cong. Rec. 1896 (1933) (remarks of Rep. Eaton); and for its first twenty years of existence it operated as a super tariff imposed on foreign manufacturers seeking to do business with the American government. *See generally* L. Knapp, *The Buy American Act: A Review and Assessment*, 61 Colum.L.Rev. 430 (1961); P. Gantt & W. Speck, *Domestic v. Foreign Trade Problems in Federal Government Contracting: Buy American Act and Executive Order*, 7 J.Pub.L. 386 (1958).

In 1954 President Eisenhower issued Executive Order 10582, 19 Fed.Reg. 8723 (1954), *reprinted at* 41 U.S.C. § 10d note (1976), to supply additional definitions to the Act's terms and make its administration uniform throughout the Executive Branch. Presently, the Act, in pertinent part, reads as follows:

> Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only such unmanufactured articles, materials and supplies as have been mined or produced in the United States, and only such manufactured articles, materials and supplies as have been manufactured in the United States substantially all from articles, materials or supplies mined, produced or manufactured, as the case may be, in the United States, shall be acquired for public use.

41 U.S.C. § 10a.[8]

■ As implemented in the Federal Procurement Regulations, the Act establishes a

---

**8.** Legislative history reveals that one of the Congress' concerns was that this Act be flexible in its operation:

> We made an attempt early in our work on this bill to draft a very complicated set of preferences, by which goods entirely manu-

factured in this country from entirely American material, would be given first choice; goods manufactured in America partly from foreign materials and partly from American materials would come next, and so on down the line. We found before we got very far

preference for "domestic source end products." This preference consists of the application of a six percent differential of the cost of the proposal, for evaluative purposes, to the price offered for other than 'domestic source end products.' 41 C.F.R. § 1–6.104. A 'domestic source end product' is defined as:

> an unmanufactured end product which has been mined or produced in the United States, or an end product manufactured in the United States if the cost of its components which are mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all of its components.

41 C.F.R. § 1–6.101(d).

Under the Act, therefore, there is concern at two levels. First, there must be a review to determine whether the "end product," the "articles, materials and supplies which are to be acquired for public use," 41 C.F.R. § 1–6.101(a), will be produced or manufactured in the United States. Second, the cost of the "components" of the "end product" that are domestically produced or manufactured—i. e., the "articles, materials and supplies which are directly incorporated" in the "end product," 41 C.F.R. § 1–6.101(b)— must exceed the cost of sovereign-produced components. *See Blodgett Keypunching Company*, 56 Comp.Gen. 18 (1976), B–153751 (Oct. 14, 1976) 76–2 CPD 331.

Unfortunately, however, "[t]he question of what constitutes an end product does not admit of an easy answer. The purpose of the procurement as demonstrated by the entire bid package has to play some part in arriving at the answer." 9 McBride & Touhey, *Government Contracts*, § 50.40[1] at 50–45 (1978).

that it meant a complicated list of 9 or 10 different preferences and it was almost impossible to work them out fairly because it would be so difficult to assign in the ultimate value how much weight should attach to the different sources of manufacture or raw material. We realized that the important thing to do was to lay down in general terms the intention of Congress, that the Federal Government and also contractors having to do with the Federal Government, should use

The first two arguments of BHT posit that the SRR helicopters are the contract end product and that the "airframe" is its major component, challenging the Coast Guard's finding that the contract end product is a system comprised of all the contract line items as unsupportable on the record. "So far as BHT is aware, the term 'system' was never used in a Coast Guard document prior to contract award to describe the end product." *Pl.Mem.* at 31 n.*. The Coast Guard's assertion that the intended end product was a 'system' is, in plaintiff's view, "a post hoc rationalization adopted after the Coast Guard was unable to show that the cost of the Aerospatiale helicopter's components exceeded the cost of its foreign components." *Id.* at 31.

The responsibility for issuing a Buy American Act determination lies with the contracting officer, and it is not a subject to which strict guidelines have been applied. Indeed, despite the requests to the Comptroller General by protesters that there should be "meaningful criteria by which contracting officers as well as contractors may receive guidance with regard to [questions relating to] the meaning of the Standard Buy American Act clause," *e. g.* 47 Comp.Gen. 21, 22 (1967), presently there are no uniform guidelines interpreting such critical terms as "manufacture," "end product," "component," or "system." *See, e. g., Alan Scott Industries*, B–193142, May 8, 1979, 79–1 CPD ¶ 316; *New Britain Hand Tools Division, Litton Industrial Products, Inc.*, B–191838, Nov. 1, 1978, 78–2 CPD ¶ 312. In addition the Comptroller General has narrowed significantly its review of bid protests alleging Buy American Act improprieties. Although the procuring agency has been directed to obtain sufficient infor-

American goods where possible and where it was a reasonable and proper thing to do. 76 Cong.Rec. 1894 (1933) (remarks of Rep. Hollister, one of the drafters).

Congress was also concerned about taking care of "American industry, the American taxpayers, and American workers as against foreign nations, foreign industries, foreign workers, and foreign taxpayers." *Id.* at 1895 (remarks of Rep. Schafer).

mation to ascertain whether foreign materials will comprise greater than 50% of the cost of contract end products, *e. g. Unicare Vehicle Wash, Inc.*, B–181852, Dec. 3, 1974, 74–2 CPD ¶ 304; 50 Comp.Gen. 697, 702 (1971); 39 Comp.Gen. 695 (1960), the Comptroller General has almost totally withdrawn from more substantive review of these protests.

We have recognized that where an offeror excludes no end products from its Buy American certificate and does not otherwise indicate it is offering anything other than domestic end products, acceptance of its offer, if otherwise responsive, results in an obligation on its part to furnish domestic end products, and compliance with that obligation is a matter of contract administration which has no effect on the validity of the contract award. (citations omitted)

*Thorsen Tool Co.*, B–188271, March 1, 1977, 77–1 CPD ¶ 154.[9]

■ In the Buy American Act determination made in the SRR helicopter procurement, the contracting officer stated that he relied on his understanding that the procurement was for a system, *Pl.Mem.* App. Part 1, B. Tr. at pp. 37; 38–9; 42–3; 82–7, on the Buy American Act certificates presented by AHC which affirmatively stated that no end products should be excluded from consideration as a domestic source end product, *see e. g. id.* Ex. ML–6 at 450; ML–7 at 453; B. Tr. at 27–8; and on the response of AHC to the "Additional Information Request" (AIR) # 195, *id.* Ex. ML–5, at pp. 4R–447; B. Tr. at 27–9; 36; 37–45; 66; 68. Following the receipt of this response, the contracting officer found he had sufficient information to answer the question whether AHC would provide a domestic source end product. *Id.* at 66.

Upon consideration of the record and the narrow focus of review, the Court cannot conclude that the contracting officer's conclusions were without a reasonable basis.

First, it appears that the Solicitation provided an objective description of the Coast Guard's needs and intent as to the contract's end products and components. It is not the Court's role to interpret phrases out of context used in miscellaneous documents relating to the contract award. Second, also contrary to BHT's assertions, there is no evidence suggesting that there has been a change in the Coast Guard's position relating to the contract end product and its components. Third, the Coast Guard's construction of the items to be procured in this contract as a system is similar to other contracts in which a system has been determined to be the end product of a challenged procurement. And, finally, although admittedly bearing differences in its Buy American Act analysis, the GAO found the Coast Guard's ultimate determination to be correct and in accordance with the law:

We agree that DOT erred in its determination that AHC was supplying a 'domestic' item. But for the reasons set forth below, we do not consider DOT's error to have been prejudicial to Bell in terms of ultimate entitlement to award.

*Bell Helicopter Textron*, B–195268, Dec. 21, 1979 at 6. In addition, the GAO went a step further than the Coast Guard, hypothesizing what the result would be if the Buy American Act computation differential had been made prior to the contract award:

The application of the 6-percent Buy American Act differential to AHC's offer would not change the order in which the offerors stand in this case. This is because, even though the addition of the differential would make AHC's cost proposal higher than Bell's cost proposal, the technical advantage in AHC's proposal under the evaluation provided in the request for proposals outweighed the cost advantage.

*Id.* at 5.

In sum, the GAO reviewed the entire procurement package and denied the pro-

---

**9.** *Accord*, Propper Mfg. Co., B–193230, Feb. 16, 1979, 79–1 CPD ¶ 117; Nicholet Technology Corp., B–192895, Sept. 8, 1978, 78–2 CPD ¶ 244; Arizona Industrial Machinery Co., B– 191178, July 25, 1978, 78–2 CPD ¶ 68, McKenna Surgical Supply, Inc., B–186895, April 15, 1977, 77–1 CPD ¶ 261.

test on the merits. While this Court must not merely rubber-stamp a procurement award that is subsequently sanctioned by the GAO, the technical expertise of both the procuring agency and the GAO should not be disturbed absent a sufficient showing of impropriety. *M. Steinthal & Co.* Here, there is no such showing on the part of BHT.

An objective description of the contract end product appears in Attachment II of the Solicitation, titled "U. S. Coast Guard Short Range Recovery (SRR) Helicopter—Cost Instructions." At Appendix I of these 'Cost Instructions' the Coast Guard sets forth a "Contrast Work Breakdown Structure (CWBS) and CWBS definitions." The CWBS is a schematic representation of the contract in outline form. It provides the Coast Guard's view of how the various contract elements fit together. By following the CWBS one can trace how individual units are first integrated into sub-assemblies, then into larger assemblies, then into components, and finally into the contract end product.[10] Listed as item coded 0000, representing the sum of all of the other line items in the contract, is the "Short Range Recovery (SRR) Helicopter System," which is defined as follows:

> This contract WBS element refers to the total buildup of all WBS elements applicable to the SRR Aircraft System. It includes Air Vehicle, Systems Test and Evaluation, System Engineering/Management, Data and Integrated Logistics Support.

*AHC Opp.,* App. Ex. 2, at 8.

The "SRR Helicopter System," based on its structural relation to the contract's other line items, defines the contract end product of this procurement. This conclusion is reinforced by the responses consistently given by the contracting officer, A. J. Beard, in his deposition. Each time he was asked by plaintiff's counsel, he stated that he considered 'all of the line items in the contract to be included within the system being procured.'[11] The contract negotiator,[12] and the chairman of the Source Evaluation Board[13] concurred. Although it appears that the Coast Guard and Department of Transportation officials who were involved in the contract award process and post-award reviews almost always described this procurement as one for "SRR helicopters," it is sufficiently clear that the agency's needs, regardless of the colloquial label that attached, were for the aggregate of the line items listed in the contract.[14]

Finally, a review of Comptroller General decisions in other cases interpreting challenges to alleged "systems" procurement, secures the foundation for the instant procurement to have the SRR Helicopter System as the contract end product. In controlled measure, the Comptroller General has stated that "[t]here is no simple answer to the question of what constitutes an end

---

**10.** The CWBS creates six "levels" of production, transposed by AHC for demonstrative purpose into a flow chart, similar to an organization chart. *See* AHC Opp., App., Ex. 1. In level I, there is only one item designated as WBS Code 0000, the Short Range Recovery (SRR) Helicopter System. In level II there are five items: the Air Vehicle (1000); System Test and Evaluation (2000); System Engineering/Management (3000); Data (4000) and Integrated Logistics Support (5000). Within these five level II items there are, in level III, 22 items; in level IV, 47 items, in level V, 62 items, and in level VI, 4 items. In total these are all of the items incorporated into the contract end product to be delivered to the Coast Guard.

**11.** *See Pl.Mem.,* App. Part I, B. Tr. at 37, 38–9, 42–3, 82–7. *See also id.,* L. Tr. at 118–9.

**12.** *See* USCG Mem. App. § D, Kantor aff. ¶¶ 5, 17.

**13.** *Id.* § A, Thorsen Aff. ¶¶ 5–17.

**14.** The Coast Guard also has provided the Court with affidavits and exhibits purporting to show that the *system* concept is one that is commonly used in that agency's major procurement projects. "Historically, the Coast Guard has not bought only aircraft, but has included training, logistics support and documentation in the procurement; the acquisition of a replacement SRR Helicopter continued that policy." USCG Mem. App. § A, Thorsen Aff. ¶ 5; *id.* § D Kantor Aff., ¶ 5. In addition, documents before the Court suggest that this particular procurement, in its genesis, was considered a system to replace the SIK HH–52A system. *Id.* § A, Thorsen Aff. ¶¶ 6, 9, 10; Ex. 6.

product . . ., the definition primarily rests on an 'exercise of procurement judgment' by the procuring agency." 48 Comp. Gen. 384, 387 (1968). To arrive at an answer "[t]he purpose of the procurement as demonstrated by the entire bid package" must be reviewed, *id.*, as the Court searches for that which represents the agency's procurement needs.[15]

The Coast Guard has submitted affidavits which offer an acceptable explanation of the relationship of each of the parts to the whole.

> In the [contracting officer's] view the 'end product' was determined by the USCG's need for the acquisition of a short range recovery capability. Nothing short of the whole contract would fulfill that need. . . . Without training, warranty and services, the SRR helicopters would not be operational or maintainable and therefore would be inadequate to fulfill the USCG's short range recovery responsibilities.

*USCG Mem.* at 30.

Plaintiff's argument that items subordinate to the major procured item or auxiliary services should not be considered components of a system is refuted by the terms of the Solicitation. The CWBS lucidly states all five of the major items of this procurement are to be treated as being of equal stature. The WBS Code number for each is in a different series (1000; 2000; 3000; 4000; 5000) and each is listed separately as distinct "Level II" elements. *See, AHC Opp.*, App.Ex. 2, at 1. In addition, contrary to plaintiff's suggestion, the CWBS definition of the 'air vehicle' (WBS # 1000) makes reference to none of the other Level II elements as incorporated in or subordinate or auxiliary to the 'air vehicle.' *Id.*, Ex. 2 at 8.

By concluding that the Coast Guard's intent in this procurement was to acquire a *system,* and that this intent was reasonable,

it follows that the five items listed in Level II of the CWBS, and in the definition of the "SRR Helicopter System" are the components of the contract end product—"those articles, materials and supplies which are directly incorporated in end products." 41 C.F.R. § 1–6.101(b). A parallel conclusion was expressed by the contracting officer in the instant Solicitation. *Pl.Mem.*, App. Part I, B. Tr. at 86. The record demonstrates ample support that this conclusion is reasonable based on prior agency procurement practices and the CWBS expression that the system was the contract end product.

With rejection of BHT's argument as to the contract end product, the dependent arguments must fail, i.e., that one of the components of the contract end product is the "airframe" and that the French manufacture of the airframe, followed by its disassembly, transport to Texas, and reassembly into the deliverable helicopter is merely a ruse designed by AHC to avoid the Buy American Act. *See Pl.Mem.* at p. 27.

■ It is reasonable to conclude, as did the Coast Guard, that the contract end product was the SRR Helicopter System which is comprised of five components: the SRR Air Vehicle, Systems Test and Evaluation, System Engineering/Management, Data, and Integrated Logistics Support. These are the items that exist in the next to the last stage of production, and they are the items directly incorporated into the contract end product. Upon the identification of the contract components the Act requires a cost-analysis only of the components themselves and not their constituent parts in order to determine the place of their "manufacture." *Hamilton Watch Co.*, B–179959, June 6, 1974, 74–1 CPD # ¶306; 45 Comp.Gen. 658 (1966).

The location of the actual integration of the five contract components will occur at

---

**15.** *See, e.g.,* Dictaphone Corp., B–191383, May 8, 1978, 78–1 CPD ¶ 343; Dubie-Clark Co., Patterson Pump Division, B–189642, Feb. 28, 1978, 78–1 CPD ¶ 161; McKenna Surgical Supply, Inc., IB–186895, April 15, 1977, 77–1 CPD ¶ 261; MR1 Systems Corp., B–184785, Nov. 19, 1976, 76–2 CPD ¶ 437; Imperial Eastman, Thorsen Tool Co., 53 Comp. Gen. 726 (1974); B–175917, July 27, 1972; 52 Comp. Gen. 13 (1972); 47 Comp. Gen. 21 (1967); 46 Comp. Gen. 813 (1967). *Cf.* Brown Boveri Corp., B–187252, May 10, 1977, 77–1 CPD ¶ 328.

AHC's facility in Texas. For purposes of the Buy American Act the remaining question is whether more than 50% of the cost of the contract end product is derived from components of American manufacture.

It also appears reasonably certain from the record that the manufacture of the five Level II items in the contract—the components of the contract end product—will occur in the United States. *See* AHC's proposed manufacturing plan, *Pl.Mem.*, App. Part 1, Ex. ML–5, Attachment B, at 426, which reveals that the incorporation and integration of the constituent parts of the air vehicle, the most expensive of the components, will occur in the United States. These subassemblies include: the airframe (WBS Code 1100); propulsion system (1200); avionics equipment (1300); avionics integration/installation (1400); and avionics software programs (1500). Similar integration work is to be performed in the United States for each of the other components of the SRR Helicopter System. This manufacturing plan was provided to the contracting officer prior to his Buy American Act determination, who could logically conclude that the contract end product was a domestic source end product that is manufactured from components wholly of domestic manufacture. While the GAO decision on this point differs, as discussed, from the Coast Guard's determination, the result remains the same. *See Bell Helicopter Textron*, B–195268, Dec. 21, 1979 at 6.

In its opposition to the motion for summary judgment plaintiff further challenges the award by arguing that AHC's SRR candidate, model SA 366, did not meet the specifications of the flight evaluation program required by the Solicitation. In section 1.1 of Attachment VIII to the Solicitation, the flight evaluation program was described:

> The Coast Guard requires that each offeror provide, as part of its response to the SRR Helicopter Request for Proposals, an instrumented helicopter for a flight evaluation at offeror's facility. The helicopter made available must be one from which the proposed SRR helicopter is di-

rectly derived. This evaluation helicopter need not be configured so as to be capable of meeting the stated Coast Guard mission and performance requirements, but must be judged as having the potential to meet those mission and design requirements listed as required in the SRR Helicopter Type Specification.

*See Pl.Mem.* at 14.

Plaintiff alleges that the helicopter AHC presented for this flight evaluation, its model 365C, is so substantially different from the SA 366, that the latter "is essentially a new helicopter and is not a direct derivative of the SA 365C." *Id.* at 17. *See also id.*, App. Part II, Lynn Aff. ¶ 8.

The purpose of the flight evaluation program was to provide actual performance data from which estimates of the performance characteristics of the SRR candidate could be extrapolated. Because the most important factor in the selection criteria was "Technical/Program Suitability," *see USCG Mem.*, App. § A, Thorsen Aff. ¶ 20, such data was essential for the evaluation of the offers submitted. The "direct derivative requirement" was a means to ensure that the data obtained would reflect, as closely as possible, the performance characteristics of the procured helicopter. Obviously, if the flight tested model were significantly different than the SRR candidate, there would be a substantial decrease in the reliability of the test data. *Pl.Mem.* at 46.

The Coast Guard has submitted the affidavits of four members of the technical evaluation study team that both conducted the flight evaluation program and later assembled and analyzed the resultant data. These affidavits establish, reasonably, that the changes between the helicopter that was flight tested and the actual SRR candidate were known and accounted for and that the data subsequently provided valid and meaningful information to enable the officials to evaluate properly AHC's proposal. *See USCG Mem.* at 23. In addition, the Coast Guard emphasizes that the Solicitation did *not* require the SRR candidate to be one already in commercial production, nor does the Solicitation contain any restric-

tion concerning the substitution of parts vendors for the SA 366 as compared to the SA 365C. The question is whether the Coast Guard is able to predict the performance impact of these changes and find that the impacts are insubstantial. Although plaintiff has described ten differences between the two helicopters, labelling them "fundamental," the Coast Guard noting that the flight evaluation program was conducted with knowledge of these changes, reflects that these changes are "typical of those made on many helicopters in the past," that despite the changes, their impact on performance characteristics is small, that "most of the changes . . . were within the state-of-the-art and such that the government had prior background and experience with analogous changes on which to draw" and that the performance characteristics of the SA 366 "were estimated by known and tested procedures which are accepted throughout the industry." In sum, the Coast Guard's position is that "the true characteristics of the SRR helicopter as proposed were established with a high degree of engineering certainty." *See id.* App. §§ F, G, H, J, Linden, Smith, Hutchins, Cate Affs.

The GAO's decision on this point is instructive:

> We believe that the determination that AHC's SA 365C had the potential to meet the agency's needs, like the evaluation of proposals, is the responsibility of the procuring activity. We will not substitute our judgment for that of the contracting officials or question their expert technical determination absent a clear showing that it was unreasonable. . . . Bell has not made such a showing and the fact that it disagrees with the judgment of

the contracting agency does not make it unreasonable.

*Bell Helicopter Textron,* B–195268, Dec. 21, 1979, at 19 (citations omitted).

██ This Court is not imbued with the aeronautical engineering or design expertise to make an independent judgment as to the reasonableness of the Coast Guard's conclusions, coupled with the GAO decision. Although the Court certainly does not subscribe to a "hands-off" attitude concerning agency determinations of complex technical matters, sometimes esoteric, interference with technical judgments of the procuring agency absent a substantial showing of unreasonableness would be improper.[16]

Plaintiff's final point of opposition requires only brief discussion. BHT challenges as arbitrary and capricious the "economic price adjustment clauses" that are included in the awarded contract. These clauses are based on domestic price indices which, plaintiff alleges, contemplate the use of domestic components, whereas AHC plans to use substantial quantities of foreign components. In the alternative, plaintiff contends that it would be improper for these domestic price indices to apply to major foreign components, arguing that these alleged conflicts provide an independent and additional basis on which the Court should rest its decision to set aside the contract award. *Pl.Mem.* at 18, 49–50.

██ The Court disagrees. Whether the clauses presently in the contract are correct based on the manufacturing plan to be used by AHC is a matter fully explored by the Comptroller General in his role to oversee government contracts; he has decided that these contract clauses are proper. The Court is not persuaded to set aside the

---

**16.** The Court is mindful of the admonition expressed in *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. at 233, 455 F.2d at 1301, which instructs the Court to conduct its inquiry for the reasonable basis on which the agency decision rests:

> This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies . . . . . Such discretion extends . . . to determinations by the agency with respect to the appli-

cation of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.

*See also* John M. Cockerham & Assoc., Decision Planning Corp., B–193124, March 14, 1979, 79–1 CPD ¶ 180; Wismer & Becker Contracting Engineers and Synthetic Fuel Corp. of America, A Joint Venture, B–191750, March 6, 1979, 79–1 CPD ¶ 148; Nanex Systems Corp., B–193252, Feb. 14, 1979, 79–1 ¶ 105.

entire contract on this ground, *see Bell Helicopter Textron*, B–195268, Dec. 21, 1979 at 35–36, "when the legal deficiencies [if any] of the decision are readily curable and the deficiencies do not squarely interfere with the rights of the party making the protest." *Curtiss Wright Corp. v. McLucas*, 381 F.Supp. 657, 661–2 (D.N.J.1974); *Keco Ind. v. Laird*, 318 F.Supp. 1361, 1365 (D.D.C. 1970). *See also Scanwell Labs v. Shaffer*, 137 U.S.App.D.C. 371, 376, 424 F.2d 859, 864 (1970).

Finally, both the Coast Guard and the GAO have stated that the differences between the two offers were significant to the extent that the addition of the 6% Buy American Act penalty would most likely have resulted in AHC being awarded the contract. The Solicitation states that "a proposal meeting minimum requirements with the lowest price may not be chosen for award if a higher price proposal contains sufficiently greater technical merit to justify the additional expenditure." *USCG Mem.* App. § A, Thorsen Aff. ¶¶ 19, 30–38, Ex. 7; *Bell Helicopter Textron*, B–195268, Dec. 21, 1979 at 5. In addition, AHC represented at oral argument that, as the contractor on this project, it presently provides substantial opportunities for domestic employment both in Texas, where its manufacturing facility is located, and throughout the country, at the facilities operated by subcontractors and other suppliers of goods and services to this contract effort. *Tr. of Aug. 27, 1979 Oral Arg.* at 34–35.

Almost no mention is made by plaintiff of the differences in technical merit between the two aircraft. But consider that "Technical/Program Suitability" was of paramount importance in the selection criteria and that within this category the AHC proposal rated higher than the BHT proposal in the most important subcriteria "Mission Capability" and "Design Quality;" and that in total, the AHC proposal was rated higher than BHT's in six of the seven criteria

analyzed. *See USCG Mem.* App. § A, Thorsen Aff. ¶¶ 30, 38. Although the Court cannot measure the qualitative differences existing between the proposals, there can be no other conclusion than the appropriateness of the award even had the 6% Buy American Act differential been applied and $12 million added, which it was not, to AHC's proposal.[17]

The Buy American Act does not express a preference for one company over another; on the contrary, its understandable and commendable emphasis is to grant a preference in public procurement to American manufacturing workers and industry. The record before the Court contains sufficient evidence to support the conclusion that substantial numbers of American workers will be employed in the performance of the SRR Helicopter System under the leadership of AHC. AHC has already subcontracted with companies in Iowa, Connecticut, New Jersey, Illinois, California, and Washington and has negotiated with companies in other states as well. *See AHC Opp.*, App. Domanovsky Aff. Ex. 1, 2.

■ Of interest, although not controlling, is the representation that should this contract award be set aside, the Coast Guard's termination liability as of mid-April 1980 would be over twenty-five million dollars. *See Tr. of May 8, 1980 Oral Arg.* at 13; *AHC Supp.Mem.*, Bacsik Aff. ¶¶ 4, 5. The entire matter must be considered, including equitable considerations of substantial performance.

It is evident that in scrutiny of the reasoned considerations attendant to the initial contract award and subsequent affirmances, and in further recognition of the experience, expertise, and collected judgment of the Comptroller General, the role of the Court is a limited one to be exercised with restraint.

---

17. *See* USCG Mem., App. § A, Thorsen Aff. ¶¶ 36, 40. *See generally* Lanier Business Products Inc., B–193597, Feb. 22, 1979, 79–1 CPD ¶ 125; Nanex Systems Corp. B–193252, Feb. 14, 1979, 79–1 CPD ¶ 105; National Puerto Rican Forum, Inc., B–189388, Nov. 23, 1977, 77–2 CPD ¶ 400; Vehicle Systems Development Corp. B–189655, Nov. 15, 1977, 77–2 CPD ¶ 370.

There existing a rational basis for the procurement decision and the procedure being neither prejudicial nor violative of applicable statutes and regulations, it is consistent with the findings herein, based on the voluminous record, that defendants are entitled to judgment as a matter of law, there being no genuine issues of material fact pursuant to Fed.R.Civ.P. 56.