**S.J. AMOROSO CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–943C.

United States Claims Court.

July 2, 1992.

Peter V. Shackter, San Francisco, Cal., for plaintiff.

John P. Sholar, with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen, and Asst. Director Martha H. DeGraff, for defendant. F. Christopher Mangan, U.S. Army Corps of Engineers, Sacramento, Cal., of counsel.

## OPINION

LYDON, Senior Judge:

### INTRODUCTION

The issue before the court involves the correct interpretation of the Buy American Act, 41 U.S.C. § 10a–§ 10d (1987) (amended 1988) (hereinafter "BAA"). Specifically, to resolve the cross motions for summary judgment, the court must decide whether, in a construction contract, the terms of the BAA apply in the aggregate to structural steel or to each individual piece of steel that is delivered to the construction site. In addition, the court must decide whether the contracting officer correctly excluded certain expenses when computing the domestic and foreign "costs" as that term is used in the BAA.

Plaintiff argues that the United States Army Corps of Engineers (hereinafter "Corps") misinterpreted the BAA when it required plaintiff to calculate the domestic portion of each individual piece of structural steel delivered to the construction site. Plaintiff claims $363,250 in damages for the expense incurred calculating the domestic portion of each piece of steel and to replace approximately one-third of the structural steel which did not meet the BAA requirements under the Corps' allegedly incorrect interpretation.

The court finds that the Corps interpreted the BAA requirements consistently with the numerous decisions of the various boards of contract appeals and the comptroller general. That interpretation is consistent with the language and purpose of the BAA. The interpretation urged by plaintiff, however, has the potential to undermine the purpose of the BAA. Therefore, the court grants defendant's motion for summary judgment and denies plaintiff's motion for partial summary judgment.

### FACTS

On August 17, 1987, the Corps and S.J. Amoroso Construction Co., Inc. (hereinafter "Amoroso"), plaintiff, entered into an appropriated fund construction contract[1] for construction of a commissary building at the Presidio, San Francisco, California, in the amount of $10,786,274.20. The contract provided a description of the work as follows:

Description of Work: 7283: Construction of reinforced concrete building (approx. 87,700SF) with concrete tilt up walls, steel roof deck, utilities, fire protection and alarm, paved parking, an [sic] landscaping: 7651A: Placement of approx. 10,600 LF of underground electrical pavement and installation of Government Furnished Equipment; 8140: Demolition of building which includes removal and disposal of asbestos siding and PCB fluorescent lighting ballast. Removal of Government salvage (gas meter, telephone booth, unit heaters, fire alarm box and sprinkler system shut off valve) which must be protected from damage during removal.

The contract was subject to the requirements of the BAA. 41 U.S.C. § 10a–§ 10d. The BAA provides, in relevant part:

Section 10a. American materials required for public use

---

1. The contract document mistakenly included a statement that the contract was a non-appropriated fund contract. Even if this statement were accepted at face value, the court would have jurisdiction since appropriated funds were in fact used for contract performance and thus the contract would be deemed an appropriated fund contract in any case. *See L'Enfant Plaza Properties v. United States,* 229 Ct.Cl. 278, 280, 668 F.2d 1211, 1212 (1982); *Wolverine Supply, Inc. v. United States,* 17 Cl.Ct. 190, 192 (1989).

Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use. This section shall not apply with respect to articles, materials, or supplies for use outside the United States, or if articles, materials, or supplies of the class to be used or the articles, materials, or supplies from which they are manufactured are not mined, produced, or manufactured, as the case may be, in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality.

Section 10b. Contracts for public works; specification for use of American materials; blacklisting contractors violating requirements

(a) Every contract for the construction, alteration, or repair of any public building or public work in the United States growing out of an appropriation heretofore made or hereafter to be made shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers, shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States except as provided in section 10a of this title: *Provided, however,* That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception....

41 U.S.C. § 10a–§ 10b.[2]

The contract was assembled with the wrong BAA clause. The clause inserted in the contract was the BAA clause for supply contracts (clause no. 79), corresponding to 41 U.S.C. § 10a, instead of the clause utilized in construction contracts (clause no. 34) which corresponds to 41 U.S.C. § 10b. There is no dispute about the fact that the contract in question was a construction contract.

Plaintiff entered into a subcontract with Bostrom–Bergen (hereinafter "Bostrom") on September 25, 1987, for structural steel, miscellaneous steel, structural welding, ultrasonic inspection of welds and steel joists. Bostrom was to fabricate, assemble and paint steel columns and beams to contract specifications from uncut steel beams. The finished pieces would consist of beams, columns, plates, struts, angles and other types of steel pieces. The process included (a) moving the raw material from the storage area to a saw for cutting to length, (b) taking the steel to an area for layout of holes, copes, shear plates, etc., (c) cutting the copes, (d) punching the holes, (e) taking the pieces to the painting area to prepare them for painting, (f) painting the pieces, (g) putting the pieces in sequence for erection, (h) loading the pieces for transportation to the construction site, and (i) erecting the pieces by crane then plumbing and bolting them.

By letter dated December 3, 1987, Bostrom informed Amoroso that it intended to purchase raw materials from a foreign source. This disclosure touched off a series of correspondence between Amoroso and Bostrom regarding compliance with

---

**2.** Amended in 1988, Pub.L. 100–418, § 7005(b), substituted "head of the Federal agency" for "head of the department or independent establishment."

the BAA. Amoroso sent a letter to Bostrom on December 10, 1987, confirming that Bostrom would provide "a breakdown of the material on a cost percentage basis for the end product that [Bostrom] is providing," and stating that "[t]he components that are of foreign origin should be identified." Bostrom responded by letter dated December 11, 1987, indicating that it would be "purchasing approximately $90,000.00 worth of material with the foreign mill. This is thirteen percent of our contract."

Amoroso advised Bostrom in a letter dated December 28, 1987, that its "products are not preassembled, therefore each item that is delivered to the site must be American made." Amoroso enclosed a Corps memo entitled "Updated Guidance on Buy American Act." The memo, dated December 9, 1982, provided in part:

3. The BAA rules *for us* remain the old 1966 October clause. For a *pure* supply contract some exceptions do appear to be available (e.g. DAR 7–104.3), but they cannot be used in construction contracts even though supply-type items are involved.

4. Under DAR 18–505 through 18–507, construction materials means articles, materials *and supplies* brought *to the site* for incorporation in the building or work. Components means articles, materials and supplies directly incorporated in construction materials.

5. Where the construction materials has only one part it becomes synonymous with component. A Japanese beam is made of one component, hence the beam is 100% Japanese. Since the beam must be 50+% "domestic" (or excluded) components, it is rejected.

6. If three beams of equal value, 1 Japanese, and 2 American are fabricated into a truss *offsite*, the truss is ⅓ Japanese components and ⅔ domestic components. It is acceptable.

. . . . .

8. Another example: foreign plywood already prefabricated into cabinets off the site would be acceptable if the plywood was less than 50% of the cost of materials in the cabinets (labor/transportation costs should also be part of the evaluation).

9. Interesting results may stem from the contractor's chosen procedures. Foreign circuit breakers brought to the site must be rejected, unless they are minor components in switchgear assembled off the site.

10. Television systems are a recurring problem. The manner in which the construction materials are brought to the site, preassembled or not, may be determinative of acceptability.

11. The same rules apply to kitchen equipment and other "supply" items furnished under a construction contract. There is no reason most problems cannot be resolved in the field.

(Emphasis in original)

Bostrom itemized the costs associated with one particular steel beam which had been fabricated from the foreign steel in a letter sent to Amoroso dated January 5, 1988. Bostrom included in the itemization the costs of the steel, labor, freight to Bostrom and to the construction site, the cost to erect the steel and the costs of the crane used to erect the beam. Amoroso forwarded the information to the Corps on January 6, 1988. According to Bostrom, the cost of the beam was more than fifty percent domestic, considering all the factors listed above, and therefore complied with the BAA.

By letter dated January 11, 1988, Amoroso requested that Bostrom confirm in writing its compliance with the BAA. Bostrom responded by letter dated January 21, 1988, providing Amoroso with a breakdown of its costs associated with all structural steel as a group and comparing the total cost of all foreign steel with the cost of all domestic product added to the steel. According to these calculations the foreign portion cost $70,000 while the domestic portion cost $101,767.64. Bostrom therefore concluded that all the structural steel was in compliance with the BAA. Amoroso revised the figures [3] and forwarded a new estimate to

3. The court is unsure how the revised estimate

was derived and cannot discern with certainty

defendant on January 26, 1988. Amoroso disallowed a portion of the domestic costs included by Bostrom and compared the $70,000 foreign costs with $88,820 domestic costs. Amoroso calculated that the steel as a group was fifty-six percent domestic and therefore complied with the requirements of the BAA. Amoroso had earlier stated, in its December 28, 1987 letter, that "each item that is delivered to the site must be American made."

On February 10, 1988, the Corps responded by letter, informing Amoroso that each piece of steel delivered to the construction site must comply individually with the BAA requirements. The Corps claimed that plaintiff had provided insufficient information to determine BAA compliance and invited Amoroso to submit further information for individual steel pieces delivered to the job site, rather than the aggregate amounts. The Corps also advised Amoroso that certain portions of the domestic work done on the foreign beams which had been included in the calculations could not be considered as part of the domestic components. Only work done on the domestic steel prior to assembly into a deliverable beam, according to the Corps, could properly be considered as part of the domestic component percentage. Thus, the Corps excluded costs relating to moving, transporting, and erecting the beams, among others. Analyzing the figures supplied by Amoroso, the Corps estimated that the domestic portion of the aggregate steel was fifty-four percent. No conclusions, however, about the compliance of individual pieces could be drawn, according to the Corps, because the domestic portion of each beam would vary with the size and composition of the beams.

As directed, Bostrom performed individual computations for the approximately 1,000 steel beams and columns required under the contract. Only ⅔ of the beams satisfied the fifty percent domestic component requirement of the BAA using these individual computations. Bostrom submitted certification to Amoroso for the ⅔ that met the requirements but not for

the ⅓ that had insufficient domestic components. Instead, Bostrom re-ordered steel from a domestic source to replace each of the beams that did not individually meet the requirements.

Amoroso forwarded the certifications for the ⅔ of the foreign source beams that individually complied with the fifty percent domestic component requirement to the Corps. On March 16, 1988, the Corps granted preliminary approval, subject to audit, for those beams. The contract was completed in a timely manner, with a cost overrun to Bostrom in the amount of $363,-250.

On June 30, 1989, Amoroso forwarded a letter dated June 27, 1989, from Bostrom to the Corps. The letter stated that Bostrom intended to submit a "total cost" claim for the overrun costs. Bostrom claimed the overrun was incurred testing each individual piece of steel delivered to the construction site for compliance with the BAA and replacing the pieces which had to be rejected because Bostrom was not permitted to calculate compliance based on the aggregate of all materials.

On December 27, 1988, Amoroso submitted a certified claim on behalf of Bostrom to the Contracting Officer (hereinafter "CO"), asserting that it was proper to test the pieces in the aggregate for compliance with the BAA, and that the Corps incorrectly required the computations to be performed for each piece of steel delivered to the construction site. Amoroso sought $363,250.00 for costs incurred as a result of individually testing the steel pieces and to replace the steel that did not satisfy those requirements.

The CO denied Amoroso's claim in a final decision issued November 21, 1990. The CO concluded that the Corps had applied the BAA requirements consistently with its policy, and that the comptroller general decisions cited by Amoroso in support of its claim applied only to supply contracts. The CO noted that the administration of the BAA for construction contracts differs greatly from that of supply contracts.

which costs were disallowed in this particular estimate.

Furthermore, the CO found that Amoroso improperly included the costs for labor when computing the cost of components under the BAA.

## DISCUSSION

The seed for this litigation was most likely sown when the contract was assembled with the wrong BAA contract clause.[4] Plaintiff argues, as it did before the CO, that the Corps misinterpreted the requirements of the Buy American Act and that it should have been permitted to calculate compliance based on an aggregate of the value of all the materials delivered under the contract, including labor costs. Generally, this is the method of calculating compliance with the BAA only for supply contracts. The court finds that plaintiff's interpretation is contrary to past interpretations of the BAA for construction contracts. Therefore, defendant's motion for summary judgment must be granted.

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). The parties agree that the material facts are not in dispute in this case. As defendant points out, there is a dispute in this case over the provisions in the contract. This is a question of law, however, which does not preclude the court from disposing of this case on summary judgment.

## I. The Contract

■ According to the *Christian* doctrine, parties to a contract are deemed to have agreed to a contract term required by law to be included in the contract. *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 11–12, 17, 312 F.2d 418, 424, 427 (1963); *See Chris Berg Inc. v. United States*, 192 Ct.Cl. 176, 182, 426 F.2d 314, 317 (1970); *Cecile Industries, Inc. v. United States*, 2 Cl.Ct. 690 (1983). Where regulations are issued under statutory authority, those regulations have the full force and effect of law. If the regulations applied, there was a legal requirement that plaintiff's contract contain the appropriate clause, and the contract must be read as if it did. *See Christian*, 160 Ct.Cl. at 12, 312 F.2d 418; *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925); *De Laval Steam Turbine Co. v. United States*, 284 U.S. 61, 73, 52 S.Ct. 78, 80, 76 L.Ed. 168 (1931); *Monolith Portland Midwest Co. v. Reconstruction Finance Corp.*, 178 F.2d 854, 858 (C.A. 9, 1949), *cert. denied*, 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352 (1950).

■ The Buy American Act mandate is incorporated into the Federal Acquisition Regulations (FARs). In relevant part, they provide, "The Contracting Officer shall insert the clause at 52.225–5, Buy American Act—Construction materials, in solicitations and contracts for construction inside the United States." 48 C.F.R. 25.205 (FAR) (1983).

Pursuant to FAR 52.225–5, codified at 48 C.F.R. § 52.225–5, the provision identified as "clause 34" should have been included in plaintiff's contract. Clause 34 states:

34. BUY AMERICAN ACT:

(a) The Buy American Act (41 U.S.C. § 10) provides that the Government give preference to domestic construction material. "Components," as used in this clause, means those articles, materials, and supplies incorporated directly into construction materials.

"Construction materials," as used in this clause, means articles, materials, and supplies brought to the construction site for incorporation into the building or work.

"Domestic construction material," as used in this clause, means (1) an unmanufactured construction material mined or produced in the United States, or (2) a construction material manufactured in the United States, if the cost of its components mined, produced, or manufac-

---

4. The court would believe that this was undoubtedly the case, except for the presence of *Wright Contracting, Inc.*, ASBCA Nos. 39120, 39121, 91–1 B.C.A. ¶ 23,649, 1990 WL 264583 (1990). That case is almost identical to the case at bar, but there is no indication that the wrong clause was included in the contract.

tured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind as the construction materials determined to be unavailable pursuant to subparagraph 25.202(a)(3) of the Federal Acquisition Regulation (FAR) shall be treated as domestic.

(b) The Contractor, agrees that only domestic construction material will be used by the Contractor, subcontractors, materialmen, and suppliers in the performance of this contract, except for foreign construction materials, if any, listed in this contract.

(The foregoing requirements are administered in accordance with Executive Order No. 10582, dated December 17, 1954, as amended, and Subpart 25.2 of the FAR).

Although this clause should have been included in plaintiff's contract, it was not. The clause that was in fact included, "clause 79," corresponds to FAR 52.225–3, which is required by FAR 25.109(d). FAR 25.109(d) and FAR 52.225–3 both apply only to supply contracts, not construction contracts.[5] Clause 79 provides:

### 79. BUY AMERICAN ACT

(a) In acquiring end products, the Buy American Act (41 U.S. Code 10a–d) is implemented by Executive Order 10582, 17 Dec. 1954, provides that the fund give preference to domestic source end products. For the purpose of this clause:

(i) "Components" means those articles, materials and supplies, which are directly incorporated in the end products;

(ii) "end products" means those articles, materials and supplies, which are to be acquired under this contract for the public use; and

(iii) A "domestic source end product" means (A) an unmanufactured end product which has been mined or produced in the United States and (B) an end product manufactured in the United States if the cost of the components thereof which are mined, produced, or manufactured in the United States exceeds 50 percent of the

cost of all its components. For the purpose of this (a)(iii)(B) components of foreign origin of the same type or kind as products referred to in (b)(ii) or (iii) of this clause shall be treated as components mined, produced or manufactured in the United States.

(b) The Contractor agrees that there will be delivered under this contract only domestic source end products, except end products:

(i) which are for the use outside the United States;

(ii) which the Government determines are not mined, produced, or manufactured in the United States in sufficient and reasonably a [sic] available commercial quantities and/or a satisfactory quality;

(iii) as to which the Secretary of the Army determines the domestic preference to be inconsistent with the public interest; or

(iv) as to which the Secretary determines the cost to the Government to be unreasonable.

Plaintiff asserts that the *Christian* doctrine should not be applied in this case to include clause 34 in lieu of clause 79. According to plaintiff, the parties used the procurement clause 79 advertently. Plaintiff distinguishes this case from *Christian*, claiming that in *Christian*, the termination clause was inadvertently excluded. Furthermore, plaintiff argues, there is no strong public procurement policy expressed by the inclusion of clause 34 rather than clause 79. Finally, plaintiff argues that the *Christian* doctrine should not be used to exclude special provisions agreed to by the parties.

The court is unpersuaded by these arguments. Primarily, the fact of whether the wrong clause was used advertently or inadvertently is irrelevant. The construction clause (clause 34) is required by law to be included in plaintiff's contract. Also, the BAA is divided into separate sections which apply in different purchasing situations.

---

**5.** As indicated previously, there is no contention that this contract is anything other than a construction contract.

The inclusion of clause 34 is a strong expression of public procurement policy, contrary to plaintiff's assertion. Plaintiff's reliance on *Chamberlain Manufacturing Corp.*, ASBCA No. 18103, 74–1 B.C.A. (CCH) ¶ 10,368 (1974), is inapt. *Chamberlain* held that even though required by the ASPR, the Government property clause did not approach the stature of a public procurement policy, unlike the Termination for Convenience clause involved in the *Christian* case. The ASBCA described the Termination for Convenience clause as "a deeply ingrained strand of public procurement policy. Regularly since World War I, it has been a major Government principle." *Id.* Surely, the BAA, enacted in 1933 and consistently applied since is comparable in stature to the Termination clause. As such, neither the parties nor this court are free to disregard those policies. *See Sprague S.S. Co. v. United States*, 145 Ct.Cl. 642, 646, 172 F.Supp. 674, 676 (1959) ("[A] court, in the application of a statute cannot evade the task of ascertaining as best it can, and then giving effect to, the Congressional purpose.") There is no latitude for the parties to decide between themselves which clause will be included, because the FAR mandates that clause 34 "shall" be included.

The BAA mandate is not lessened by plaintiff's attempt to characterize clause 79 as a "special provision agreed to by the parties." Had the parties wanted to avoid the strict requirements of the BAA in this case, there are provisions that allow for flexibility and exceptions, within established guidelines.[6] There is no evidence that these provisions apply in this case, presumably because they do not. In any case, even if plaintiff could prove conclusively that the parties had agreed to include clause 79 rather than clause 34 as required, the *Christian* doctrine would still apply.[7] "The goal served by this action is that 'procurement policies set by higher authority [are] not ... avoided or evaded (deliberately or negligently) by lesser officials....'" *IBI Sec. Serv., Inc. v. United States*, 19 Cl.Ct. 106, 106–107 (1989) (quoting *G.L. Christian and Associates v. U.S.*, 160 Ct.Cl. 58, 66, 320 F.2d 345, 351 (1963).) (emphasis in original), *aff'd* 918 F.2d 188 (Fed.Cir.1990).

Additionally, the contract includes other mistakes.[8] For example, the contract includes the standard non-appropriated fund (NAF) contract clause (clause 75). In fact, this contract is an appropriated fund contract. Neither party disputes this, despite the inclusion of the NAF clause in the contract. Yet, this clause is also a "special

**6.** *See* Buy American Act, 41 U.S.C. § 10b (1987) (as amended) ("*Provided, however,* That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost an exception shall be noted in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception."); FAR 25.202 to 25.205 (1983); *See C. Sanchez & Son, Inc. v. United States*, 24 Cl.Ct. 14, 17 (1991); *see also John C. Grimberg Co. v. United States*, 869 F.2d 1475 (Fed.Cir.1989) (allowing waiver of BAA after award of contract). The procurement practice of the Corps in this case does not show that it was the intent of the parties to avoid the BAA pursuant to these provisions.

**7.** There is no evidence before the court relating to the circumstances which led to the inclusion of particular provisions in the contract, other than plaintiff's bald assertion that clause 79 was advertently included. To resolve the cross motions for summary judgment, the court is to

believe any evidence presented by the opponent and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). One could infer from the inclusion of the provision itself that it was done advertently, but this inference, even if drawn, would be immaterial under the circumstances.

**8.** The solicitation for this contract states that this contract is not reserved for small business set aside, yet the contract contains a provision so reserving the contract. Amoroso is not a small business.

The unusual number of drafting mistakes in this contract also detracts from plaintiff's argument that clause 79 was included advertently. *See* n. 7, *supra*. In fact, the first time clause 79 was discussed is apparently in defendant's brief in support of its motion for summary judgment. Had plaintiff negotiated or held a stake in the specific clause, one would expect that plaintiff would have drawn attention to the matter during its attempt to resolve the dispute before domestic steel was ordered to replace the nonconforming foreign beams.

provision." Were the court and the parties bound to abide by the clause, as plaintiff's reasoning relating to the applicability of the *Christian* doctrine to "special clauses" might suggest, the court arguably might be without jurisdiction to hear the case. *See L'Enfant Plaza Properties v. United States*, 229 Ct.Cl. 278, 280, 668 F.2d 1211, 1212 (1982) (Claims Court does not have jurisdiction over cases where contract sued upon cannot be satisfied out of appropriated funds); *but see* n. 1, *supra.* Rather, the court recognizes, and the parties agree, that in fact this is an appropriated fund construction contract over which jurisdiction is clear. The court can see no reason to differentiate between the treatment of these two mistaken clauses.[9]

Regardless of why or how the supply contract clause came to be included in plaintiff's contract, it is the province of the court to interpret the contract according to sound principles of law. The court can discern no compelling argument why the *Christian* doctrine should not apply in light of the circumstances and the clear mandate of the BAA. Therefore, clause 34, relating to construction contracts, is deemed to be included and clause 79, relating to supply contracts, is deemed not to be included in plaintiff's contract.

## II. The Buy American Act

The issue for the court to decide, then, is whether plaintiff's claim that the Corps misinterpreted the requirements of the BAA has merit. Plaintiff argues that consistent with the BAA, it should have been allowed to determine the domestic percentage based on an aggregate of all the structural steel, rather than for each individual beam delivered to the site, as defendant required.

### A. Standard of Review

The interpretation of the BAA in relation to this question has not been addressed by the Claims Court. However, many deci-

sions by the various boards of contract appeals and the Comptroller General have dealt with this question and thus have rendered interpretations of the Act relative thereto. "It is of course well established that Board determinations on questions of law are not binding on the court. *Gorn Corp. v. United States*, 191 Ct.Cl. 560, 562, 424 F.2d 588, 589 (1970). However, such Board determinations by tribunals having expertise in construction contract matters can be helpful even if not compelling on the court." *United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed.Cir.1987); *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984); *see also Hegeman–Harris & Co. v. United States*, 194 Ct.Cl. 574, 580, 440 F.2d 1009, 1011 (1971).

The court's review of administrative interpretation in this case is somewhat limited. *Nabisco, Inc. v. United States*, 220 Ct.Cl. 332, 340, 599 F.2d 415 (1979). "When a court is asked to construe the meaning of an administrative regulation, deference to the agency's interpretation is in order." *IBI Sec. Serv., Inc. v. United States*, 19 Cl.Ct. at 110; *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulations." *Bowles v. Seminole Rock and Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

[T]o sustain an administrative interpretation of a regulation issued by it, it is not necessary to find that the agency construction is the only reasonable one, or even that it is the result a court would have reached had the question arisen in the first instance in judicial proceedings. Where administrative control has been authorized by Congress, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.

*Port Auth. of Saint Paul v. United States*, 193 Ct.Cl. 108, 120, 432 F.2d 455,

---

9. Indeed, the court can imagine a situation, possibly the situation of this case, wherein the inclusion of the NAF clause triggered the use of the supply contract BAA provision, clause 79.

*See, e.g.* Army Regulations 215–1, DA form 4075–R (requiring supply contract Buy American Act clause (clause 79) to be included in NAF contract).

461 (1970) (citing *Mississippi Valley Barge Line Co. v. United States*, 292 U.S. 282, 286–87, 54 S.Ct. 692, 693–94, 78 L.Ed. 1260 (1934)). Thus, the court must determine only whether the agency has interpreted the regulations issued under statutory authority in a rational manner. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 844, 104 S.Ct. 2778, 2781, 2782, 81 L.Ed.2d 694 (1984).

### B. Buy American Act Interpretation

■ There are two lines of cases dealing with the Buy American Act, one stemming from the administration of supply contracts and the other from that of construction contracts. There is a material distinction between both the administration and outcome of these two types of contracts. *See Hegeman–Harris & Co. v. United States*, 194 Ct.Cl. at 587; 51 Comp.Gen. 814 (1972). The distinction between the types of contract is evident in the language of the regulations and the contract clauses, quoted above. The Buy American Act guidelines apply to "end products" in supply contracts and "construction materials" in construction contracts.

The construction contract decisions by the various boards of contract appeals and the comptroller general have consistently held that each individual piece of construction material delivered to the construction site must comply with the BAA mandate that at least fifty-percent of the components thereof be domestic.[10] Since the court has determined that plaintiff's contract is deemed to include the construction contract BAA clause, (clause 34), there is no need to extensively address the supply contract line of cases and administrative interpretation. The court notes, however, that plaintiff's argument that the aggregate of the steel should be considered to determine compliance with the BAA closely parallels the line of cases interpreting the administration of supply contracts. Indeed, many of the cases plaintiff cites are supply contract cases.

The lead case interpreting construction contract regulations, (clause 34), is *George Hyman Constr. Co.*, ASBCA No. 13777, 69–2 B.C.A. (CCH) ¶ 7830, 1969 WL 688. The issue before the board was to determine where to draw the line between "construction materials" and "components." The board found that "[t]he Buy American status of materials or products may be influenced by procurement intent. Also the state of assembly or disassembly of items upon arrival at the site of incorporation may become determinative." *Id.* If delivered unassembled, the item was a construction material, even if the item would be assembled into another item at the construction site. Each construction material is subject to the BAA. A "component" is an item which must be incorporated directly into a construction material. The component itself may be foreign made, as long as the cost of the assembled item's domestic components exceeds fifty-percent of the cost of all the item's components. This analysis has been adhered to ever since. *See Ed Allen L. Bender, Inc.*, ASBCA No. 38068, 89–3 B.C.A. (CCH) ¶ 22,092, 1989 WL 82129; *Loshbaugh & Sons, Inc.*, ASBCA No. 36104, 88–3 B.C.A. (CCH) ¶ 21,023, 1988 WL 81123; *Swanson Products, Inc.*, ASBCA No. 33493, 87–1 B.C.A. (CCH) ¶ 19,661 (1987), 1987 WL 40733; 69 Comp. Gen. 212 (1990); 51 Comp.Gen. at 818; 46 Comp.Gen. 813, 817 (1967).

In fact, *Wright Contracting, Inc.*, ASBCA Nos. 39120, 39121, 91–1 B.C.A. (CCH) ¶ 23,649, 1990 WL 264585 (1990), is directly on point. In that case, Bay Area Crane–Hoist, Inc., was awarded a subcontract for "fabrication and erection of the structural steel ... [which] involved cutting, drilling, shaping and welding structural pieces from steel plates and beams". *Id.* The board denied plaintiff's claim that the government wrongfully rejected plaintiff's proposal to fabricate structural steel from foreign plates and beams after considering many of the same arguments advanced by plaintiff. Each beam delivered to the site was required to comply individually with the BAA. Plaintiff does not cite, and the court

---

**10.** It is undisputed that "substantially all" as it is understood in the BAA means "50% domestic."

*See* Executive Order 10582, dated December 17, 1954, cited at 41 U.S.C. § 10d note, as amended.

has been unable to find, any cases to refute that this is the proper analysis of the construction contract BAA clause. Even if this holding is consistent with the interpretation of the Act by other boards and the Comptroller General, however, the court is obligated to review the interpretation to determine whether it is unreasonable.[11]

Plaintiff argues that regardless of whether the steel is characterized as an end product or construction material, the entire structural steel should be considered to comply because it was partially assembled prior to being brought to the construction site for erection. This analysis is contrary to the holding in *John T. Brady & Co.*, VABCA No. 1300, 84–1 B.C.A. (CCH) ¶ 16,925, 1983 WL 13698 (1983). The contractor in that case argued that where it was required to preassemble panels of a metal curtain wall and bring them to the site, the entire erected wall, rather than each panel delivered to the site, should be considered to establish compliance with the BAA. The board rejected this argument as an unreasonable interpretation. The preassembled panels, containing foreign aluminum, that were separately delivered to the site were required to individually comply with the BAA. *See also Wright,* ASBCA Nos. 39120, 39121, 91–1 B.C.A. (CCH) ¶ 23,649, 1990 WL 264583 (1990). Likewise, the court rejects plaintiff's argument. Partially assembled items delivered to the construction site, according to the interpretation consistently followed by the boards and the Comptroller General, are construction materials subject to the requirements of the Buy American Act.

Nevertheless, plaintiff insists that the aggregate of the steel delivered to the site should have been considered to determine compliance with the BAA, and that the "same results obtain" regardless of which BAA clause is included in the contract.

Plaintiff reaches this conclusion based in part on its argument that "construction materials" which contain "components" is *in pari materia* with "end products" which contain "components". Also, according to plaintiff, the structural steel could be considered as an end product, which would comply with the BAA requirements. As an example in support of its argument, plaintiff cites *Textron, Inc., Bell Helicopter Textron Div. v. Adams,* 493 F.Supp. 824 (D.D.C.1980) (upholding Coast Guard's application of the BAA, holding, *inter alia,* that Coast Guard's determination that end product, for purposes of applicability of BAA, was not merely the helicopter itself but rather a helicopter system was not without reasonable basis). The court in *Textron* concluded, based on the purpose of the procurement as demonstrated by the entire bid package that the contract end product was the SRR Helicopter system made up of the items listed in the contract. *Id.* at 834. In the case at bar, plaintiff asserts, each of the items listed in the description of work, namely the construction of the building, the demolition, the laying of underground electrical pavement, and the salvage could be considered to be end products of the contract at issue in this case. Plaintiff argues essentially that it provided a "fully assembled steel structure to form the skeleton of a building." (Pl. Reply Brief p. 2). Plaintiff also points to the fact that in *Hyman,* the board discusses the completed building in terms of an "end product", which is supply contract language, in the context of a construction contract.

Plaintiff's argument indicates that plaintiff fails to consider the distinction between construction and supply contracts.[12] *Textron* dealt with a supply contract, not a construction contract. To an extent the two can be compared, but it must be re-

---

11. In the case at bar, plaintiff argues that *Wright* was wrongfully decided. The court's review of the interpretation of the BAA at issue, however, is limited to the determination of whether the Corps' interpretation is unreasonable. Therefore, it is not necessary, nor is it appropriate to reach the question of whether *Wright* was wrongfully decided.

12. Despite plaintiff's assertion that the interpretation it advances has been customarily followed in other contracts, the court believes that plaintiff is merely trying to maintain its claim in the face of the contract language of clause 34, which it apparently did not consider or anticipate previous to defendant raising it in its motion for summary judgment.

membered that contract administration and the application of the BAA differ for the two types of contracts by the very terms of the BAA legislation. *Compare* 41 U.S.C. § 10a *with* 41 U.S.C. § 10b. It is clear that plaintiff's contract was a construction contract, not a supply contract, and that the completed building was the subject of the procurement. The completed building may be described as an "end product", as it was in *Hyman,* by virtue of its being the purpose of the procurement. This does not, contrary to plaintiff's argument that the "same result obtains" regardless of which contract clause is used, indicate that a "construction material" and an "end product" are indistinguishable for purposes of the Buy American Act. *See* 51 Comp.Gen. at 818 (considering structural steel to be a construction material, stating, "unlike the evaluation of a bid under an [invitation for bid] for a supply contract, the evaluation of a bid for a construction contract under the Buy American Act takes into consideration each particular item of construction material to be brought to the construction site for incorporation in the building or work."). Furthermore, even though the procurement purpose of the contract is helpful in determining where to draw the distinction between components and construction materials, *see Hyman,* the Act explicitly applies to construction materials which are explicitly defined as "articles, materials, and supplies brought to the construction site for incorporation into the building or work." 48 C.F.R. § 52.225–5 (FAR).

It may be that an agency could procure separate items for the construction of a building and that these could be supply contracts for purposes of the BAA such that the aggregate of the structural steel could be considered "end products." But this is not the circumstance of this contract. In any case, even if the structural steel could be considered to be an "end product" of the construction contract, there is no separate procurement, nor even a separate description of the structural steel in the description of work to form a basis for plaintiff's position. Additionally, the mere fact that Amoroso subcontracted the structural steel work is irrelevant to the application of the BAA.

Plaintiff's basic argument, that the structural steel as a whole, rather than individual beams, could be considered as an end product for purposes of the BAA is not entirely unreasonable. For instance, the board stated that there was "no inconsistency between a given article's classification as an end product under a particular procurement and its subsequent classification as a component under another contract under which that article will be incorporated into a different end product." 56 Comp. Gen. 596 (1977) (citing 48 Comp.Gen. 384 (1968)). It does not follow, however, that plaintiff should be entitled to convert a construction contract "construction material" into a supply contract "end product." This also appears to be the fallacy of plaintiff's attempt to distinguish the cases interpreting the BAA on their facts. The task is not one of comparing facts but of applying the law. The discretion to decide when and how it is in the public interest to apply the BAA is vested in the heads of the government departments, not contractors or subcontractors. 51 Comp.Gen. 195, 198 (1971); *see* FAR 25.202 to 25.205, 41 U.S.C. § 25.2. Plaintiff's interpretation strains the plain meaning of the definitions at 48 C.F.R. § 52.225–5 (FAR) (clause 34). It would also allow the Act to be too easily manipulated by parties not vested with the discretion to do so and would thereby undermine the integrity of the BAA. This the court cannot allow.

Plaintiff argues that the Corps' interpretation of the BAA leads to an unreasonable result, because items of the same nature are acceptable under one procurement and unacceptable under another. While this may or may not be the case, there is nothing unreasonable about such an outcome. The possibility of different results are understandable given the inherent difference in the administration and procurement intent of supply and construction contracts. The Comptroller General addressed this argument in 47 Comp.Gen. 21, 23 (1967), where the contractor argued that the applicability of the Act depends on the "fortuitous circumstance of how broadly a procur-

ing activity happened to describe what it was purchasing." As noted above, the procurement intent is one of the factors which helps determine the applicability of the Act.

Further, even if the inherent difference is ignored, the court notes that the Act provides for some flexibility where it is in the public interest to avoid the BAA. The procuring agency is vested with the discretion to make decisions applicability of the Act. The court in *Textron* stated, "[l]egislative history reveals that one of Congress' concerns was that this Act be flexible in its operation" *Textron*, 493 F.Supp. at 830–31, n. 8. Quoting from the remarks of Rep. Hollister, one of the drafters, the court noted:

> "We made an attempt early in our work on this bill to draft a very complicated set of preferences.... We found before we got very far that it meant a complicated list of 9 or 10 different preferences and it was almost impossible to work them out fairly because it would be so difficult to assign in the ultimate value how much weight should be attached to the different sources of manufacture or raw material. We realized that the important thing to do was to lay down in general terms the intention of Congress, that the Federal Government and also contractors having to do with the Federal Government, should use American goods where possible and where it was a reasonable and proper thing to do."

*Id.* (citing 76 Cong.Rec. 1894 (1933)). This flexibility is demonstrated in the language of section 10b of the Act. *See* 41 U.S.C. § 10b(a); n.6, *supra.*

The court rejects plaintiff's interpretation not only because plaintiff has not shown the Corps' interpretation to be unreasonable, as it must do to meet its burden in this case, but also because the court is troubled by the implications of plaintiff's asserted interpretation. Plaintiff's interpretation would allow a contractor to use more rather than less foreign steel in the construction of a building subject to the BAA. If the court agreed to plaintiff's interpretation in this case, 100% of the steel beams from a foreign source would comply with the BAA. But it is clear from the legislative history that this is what the Act sought to prevent. *See* 46 Comp.Gen. at 819. (discussing the legislative history which indicated that bringing in foreign material and assembling it would not satisfy the purpose of the Act). As it is, it appears that a subcontractor can manipulate the Act by combining its materials in proportions that meet the BAA requirements. Indeed, the subcontractor in this case was able to comply with the BAA using foreign source steel for ⅔ of the structural beams because it combined the beams with domestic steel. One of plaintiff's assertions is that the Corps' interpretation is unreasonable because it necessitates determining the domestic cost percentage for each piece of structural steel delivered unassembled to the site which plaintiff claims is time consuming, costly and inefficient. Even if true, this would presumably be taken into consideration by the procuring agency when it applied the BAA. But it seems that it is the practice of combining domestic and foreign materials in cases where each construction material must comply with the act, rather than the Corps' interpretation of the Act, which increases expense, time and inefficiency to determine compliance with the BAA. If a contractor uses domestic source materials, the individual computations for each piece of construction materials delivered to the construction site is unnecessary. If, on the other hand, a contractor chooses to use foreign source materials, it must then bear the costs associated with compliance with the BAA. Therefore, plaintiff should not be heard to complain that it is illogical for this Act to be construed to prevent it from using foreign source steel for 100% of the building's structural beams.

C. Domestic "costs".

■ Plaintiff argues also that labor and transportation should be included in the computations to determine compliance with the BAA. Bostrom analogizes its situation to that of example 8, relating to the plywood cabinets, in defendant's memo entitled "Updated Guidance on the Buy American Act" which Bostrom received from

Amoroso. The example indicates that "labor/transportation costs should also be part of the evaluation." *Supra* at p. 762. In further support of its contention that labor should be included, plaintiff cites the legislative purpose of the Act to protect American workers.

This position is directly contradicted by the plain language of both construction and supply provisions which do not allow for labor and transportation. As recognized by the Comptroller General, "since various elements (labor, freight, profit overhead, etc.) included in the price of a manufactured article are not considered to be 'products' or 'components' used therein, the cost of these items must be excluded from consideration in determining whether the article is foreign or domestic ..." 46 Comp. Gen. 784, 787 (1967); *see* 51 Comp.Gen. 538, 540 (1972) (holding that items which are not to become part of the buildings or other structures which are being constructed under the prime contract are not components of the construction material). The ASBCA also subscribes to this interpretation. *See Wright*, ASBCA Nos. 39120, 39121, 91–1 B.C.A. (CCH) ¶ 23,649, 1990 WL 264583 (1990) (finding that the foreign structural steel "did not come within the definition of "domestic product" under the Buy American Act, because the only added cost to the steel was the labor of fabricating it and labor is not a component"). There may be supply contract circumstances where appropriate overhead costs may be included in computing end product component costs but "these circumstances are limited to those in which a bidder itself is fabricating the components which make up the end item." 69 Comp.Gen. 307, 309 (1990) (citing 50 Comp.Gen. 697 (1971)). The interpretation of the BAA as demonstrated by these cases and others do not appear and have not been shown to be unreasonable.

Furthermore, plaintiff's analogy is inappropriate. As Amoroso apparently recognized, an analogy to examples 5 and 6 is more apt. Preparing and assembling a steel beam to make it suitable for incorporation into a structure is materially different from manufacturing cabinets out of plywood and delivering them fully assembled to the construction site. Plaintiff does not, nor could it successfully contend that it should be considered to have manufactured the structural steel beams in this case. *See Wright*, ASBCA Nos. 39120, 39121, 91–1 B.C.A. (CCH) ¶ 23,649, 1990 WL 264583 (1990) (finding that contractor who cut, drilled, shaped and welded structural pieces from plates and beams had not manufactured the structural pieces because the fabrication process did not substantially change the metallurgical properties of the materials); 69 Comp.Gen. 307, 308 (1990) (discussing test to establish manufacturing); 45 Comp.Gen. 658, 659 (1966) (discussing the manufacture of billets from foreign ingots). In addition, it appears that the plywood cabinets described in example 8 may be the subject of example 11, which indicates along with example 3 that even "supply" items furnished under a construction contract are analyzed according to construction contract guidelines for the BAA.

Plaintiff's legislative purpose argument also misses the mark. While the court accepts that the protection of American workers is one of the purposes of the Act, it appears that the Act was designed to protect American industry and capital investment as well. In *Textron*, the court noted that "Congress was ... concerned about taking care of 'American industry, the American taxpayers, and American workers as against foreign nations, foreign workers and foreign taxpayers.'" *Textron*, 493 F.Supp. at 830–31, n. 8 (quoting 76 Cong.Rec. at 1895 (remarks of Rep. Schafer)). The American steel industry and American steel workers, for example, do not appear to be protected by the use of 100% foreign steel, which, as noted above, may result from plaintiff's interpretation. Furthermore, Bostrom's employees, who are responsible for preparing the steel according to contract specifications, would be unaffected by the use of foreign steel. Presumably, the same work would need to be done regardless of the source. Therefore, it appears that the Corps' interpretation of the Act, which in this case results in a greater overall use of domestic steel in this case is more likely to further the legis-

lative purpose of the BAA than is plaintiff's interpretation. In any case, it does not appear that the Corps' interpretation is in any way unreasonable. Plaintiff is reminded, as stated above, that it may not attack the validity of the agencies' interpretation on the grounds that there is a more reasonable interpretation, as long as the agency's interpretation is rational. *See Port Auth. of St. Paul v. United States,* 193 Ct.Cl. at 120, 432 F.2d at 461.

The court finds that plaintiff's interpretation is contrary to the interpretation of the Act as it has been applied by the boards of contract appeals and the Comptroller General. Plaintiff has not persuaded the court that the Corps' interpretation is incorrect, contrary to congressional intent, or unreasonable. The court can discern no argument for reinterpreting the BAA or for refusing to follow the boards and the GAO which have greater expertise making judgments about the application of the BAA, as intended when Congress enacted the Act. Therefore, the court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

### CONCLUSION

Accordingly, defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied. The clerk is directed to enter judgment dismissing the complaint. No costs.